[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-10685

_____

D.C. Docket No. 8:15-cv-02736-RAL-AEP


JOSEPH F. MORRISSEY,

Plaintiff - Appellant,

versus

UNITED STATES OF AMERICA,

Defendant - Appellee.


_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(September 25, 2017)

Before WILSON and NEWSOM, Circuit Judges, and MORENO,* District Judge

NEWSOM, Circuit Judge:

_____

*Honorable Federico A. Moreno, United States District Judge for the Southern District of Florida, sitting by designation.

This is a tax case. Fear not, keep reading. In determining whether the IRS properly denied a taxpayer's claimed deduction on his 2011 return, we must decide two important and (as it turns out) interesting questions. First up: Was the money that a homosexual man paid to father children through *in vitro* fertilization—and in particular, to identify, retain, compensate, and care for the women who served as an egg donor and a gestational surrogate—spent "for the purpose of affecting" his body's reproductive "function" within the meaning of I.R.C. § 213? And second: In answering the statutory question "no," and thus in disallowing the taxpayer's deduction of his IVF-related expenses, did the IRS violate his right to equal protection of the laws either by infringing a "fundamental right" or by engaging in unconstitutional discrimination?

We hold that the costs of the IVF-related procedures at issue were not paid for the purpose of affecting the taxpayer's own reproductive function—and therefore are not deductible—and that the IRS did not violate the Constitution in disallowing the deduction.

**I**

**A**

Plaintiff-Appellant Joseph F. Morrissey is a homosexual man. He has been

2

in a monogamous relationship with his male partner since 2000.[1]  Although Mr.

Morrissey concedes that he is not medically infertile, he characterizes himself as

"effectively" infertile because he is homosexual and because it is physiologically

impossible for two men to conceive a child through sexual relations.

In 2010, Mr. Morrissey and his partner decided to try to have children

through IVF, with Mr. Morrissey serving as the biological father.  The IVF process

involved collecting Mr. Morrissey's sperm, using that sperm to fertilize eggs

donated by one woman, and then implanting the resulting embryos into the uterus

of a second woman who served as a gestational surrogate.  Between 2010 and

2014, Mr. Morrissey paid expenses related to (among other things) seven IVF

procedures, three egg donors, three surrogates, and two fertility specialists.  All

told, the IVF process cost Mr. Morrissey more than $100,000.  In 2011 alone—the

tax year at issue in this case—Mr. Morrissey paid nearly $57,000 out of pocket for

IVF-related expenses.

Of that total, only about $1,500 went toward procedures performed directly

on Mr. Morrissey's body—namely, blood tests and sperm collection.  He spent the

remaining $55,000 to identify and retain the women who served as the egg donor

and the gestational surrogate, to compensate those women for their services, to

reimburse their travel and other expenses, and to provide medical care for them.

---

[1] Mr. Morrissey and his partner married in June 2016, but they were not married during the timeframe relevant to the issues in this appeal.

**B**

Mr. Morrissey did not initially claim a deduction for medical expenses on his 2011 tax return. That return showed that Mr. Morrissey owed $22,449, which he paid. In December 2012, however, Mr. Morrissey timely filed an amended 2011 return that claimed a medical-expenses deduction in the amount of $36,538. Based on the newly claimed deduction, Mr. Morrissey's amended return sought a $9,539 refund.

In 2011, I.R.C. § 213 allowed a taxpayer to claim a deduction for "medical care" expenses that exceeded 7.5% of his adjusted gross income. I.R.C. § 213 (2005).[2] All parties agree that, standing alone, the $1,500 that Mr. Morrissey spent for his own blood work and sperm collection doesn't meet the 7.5% threshold. Accordingly, Mr. Morrissey can't deduct those expenses unless he can also deduct the much more significant costs associated with the identification, retention, compensation, and care of the egg donor and the gestational surrogate.

The IRS denied Mr. Morrissey the refund he sought. After examining Mr. Morrissey's amended return, the IRS disallowed his IVF-related deduction in its entirety. The agency's formal claim-disallowance letter explained that I.R.C. § 213, which governs deductions for "medical care" expenses, "states that Medical

---

[2] This AGI-based limitation accounts for the difference between the nearly $57,000 that Mr. Morrissey paid in IVF-related expenses in 2011 and the $36,538 that he claimed as a medical-expenses deduction. The AGI threshold has since been increased to 10%. *See* I.R.C. § 213(a) (2010) (increasing the AGI threshold to 10% beginning with the 2013 tax year).

Care must be for Medical Services provided to the taxpayer, his spouse, or dependent"—which, overwhelmingly, the services underlying Mr. Morrissey's claimed deduction were not**.** Mr. Morrissey appealed to the IRS Office of Appeals, which upheld the disallowance.

## C

Following the IRS's final determination, Mr. Morrissey filed this refund suit in the United States District Court for the Middle District of Florida. His complaint asserted two claims. First, Mr. Morrissey contended that "Tax Code Section 213, as plainly written, authorizes [his] requested deduction." Second, he argued that the IRS's disallowance of his claimed deductions violated the equal protection component of the Fifth Amendment. Following abbreviated discovery, the parties filed competing summary judgment motions. In a written order, the district court granted summary judgment for the IRS.

Mr. Morrissey timely appealed. We review the district court's summary judgment decision *de novo*. *Global Quest, LLC v. Horizon Yachts, Inc.,* 849 F.3d 1022, 1026 (11th Cir. 2017).

## II

On appeal, Mr. Morrissey renews his arguments (1) that under I.R.C. § 213, all of the IVF-related costs that he paid in 2011 are deductible "medical care" expenses, and (2) that in denying his requested deduction, the IRS violated his

5

equal protection rights.  We consider his contentions in turn.

## A

In pertinent part, I.R.C. § 213(a) states as follows: "There shall be allowed as a deduction the expenses paid during the taxable year, not compensated by insurance or otherwise, for medical care of the taxpayer, his spouse, or a dependent …."  Particularly important to this appeal is Section 213(d)'s definition of the term "medical care" as it is used in Section 213(a)—as relevant here, "[t]he term 'medical care' means amounts paid … for the diagnosis, cure, mitigation, treatment, or prevention of disease, or for the purpose of affecting any structure or function of the body."  I.R.C § 213(d).

Mr. Morrissey rests his statutory argument on a specific portion of Section 213(d)'s definition.  He doesn't contend that his claimed deduction fits within Section 213(d)'s first, "disease" clause.  Nor does he rely on the phrase "structure … of the body" in Section 213(d)'s second clause.  Rather, Mr. Morrissey asserts that all of the IVF-related expenses that he incurred in 2011 are deductible as "medical care" on the ground that they constitute amounts paid "for the purpose of affecting any … function of the body."  Significantly, because (as applicable here) Section 213(a) allows a deduction for medical care "of the taxpayer," all agree that "the body" at issue in Section 213(d)'s definition is the taxpayer's own—not a

6

third party's.[3]  Accordingly, the lone statutory question before us is whether the $36,538 in IVF-related expenses for which Mr. Morrissey claims a deduction constitute amounts paid for the purpose of "affecting any … function of [Mr. Morrissey's] body."

In an effort to bring his case within Section 213(d)'s terms, Mr. Morrissey contends that all of the IVF-related expenses that he incurred—including the costs attributable to the identification, retention, compensation, and care of the women who served as the egg donor and the surrogate—were made for the purpose of affecting his body's *reproductive* function.  Br. of Appellant at 6.  In particular, Mr. Morrissey asserts that because he and his male partner are physiologically incapable of reproducing together, IVF was his only means of fathering his own biological children.  Accordingly, Mr. Morrissey claims, it was medically necessary to involve third parties—a female egg donor and a female surrogate—in order to enable his own body to fulfill its reproductive function.

Section 213's plain language—and particularly the ordinary meaning of the statutory terms "affecting" and "function"—forecloses Mr. Morrissey's argument. First, "affecting."  The word "affect" means to "produce an effect upon" or (less tautologically) "to produce a material influence upon or alteration in."  *Webster's*

---

[3] Section 213(a) also covers medical care of a taxpayer's "spouse" or "dependent," but it is undisputed that the women who served as the egg donor and gestational surrogate are unrelated to Mr. Morrissey.

7

*Third New International Dictionary* 35 (2002); *see also Webster's Second New International Dictionary* 42 (1959) (defining "affect" as "to lay hold of or attack (as a disease does); to act, or produce an effect, upon; to impress or influence (the mind or feelings); to touch"). Tracing Section 213(d)'s language, we must therefore determine whether the IVF expenses at issue were paid for the purpose of *materially influencing or altering* some function of Mr. Morrissey's body.

Now, to "function." The term "function" is defined as "the action for which a person or thing is specifically fitted, used, or responsible or for which a thing exists"; "the activity appropriate to the nature or position of a person or thing"; or "one of a group of related actions contributing to a larger action," such as "the normal and specific contribution of any bodily part (as a tissue, organ, or system) to the economy of a living organism." *Webster's Third New International Dictionary* 920-21 (2002); *see also Webster's Second New International Dictionary* 1019 (1959) (defining "function" as "the natural and characteristic action of any power or faculty" or "action; activity; doing; performance"). Stated less technically, it seems fair to summarize—and the parties don't disagree—that the term "function" denotes a person's or thing's unique task or role.

Statutory context yields an additional—and important—insight. In Section 213(d), the word "function" is followed by the prepositional phrase "of the body." That limiting modifier, referring as it does to one "body" rather than multiple

8

"bodies," confirms what Section 213(d)'s plain language indicates—that at least in this context, "function" is an attribute of a singular thing and, accordingly, that the statutory definition should be understood to cover medical care that affects the function of one body, while excluding care that might be thought to affect some "function" achieved by the cooperation of multiple bodies.

Plugging in our definitions, then, the question is whether the IVF-related expenses that Mr. Morrissey incurred—including the costs of identifying, retaining, compensating, and caring for an egg donor and a gestational surrogate—were incurred for the purpose of *materially influencing or altering* (*i.e.*, "affecting") an *action for which Mr. Morrissey's own body is specifically fitted, used, or responsible* (*i.e.*, his body's "function").  Mr. Morrissey's position—that all aspects of IVF treatment, including those bearing on a woman's distinctive contributions, altered his reproductive function—mistakes the entire reproductive *process* for his own body's specific *function* within that process.

We begin, of necessity, with a primer on the science of human reproduction. (Some of this must surely seem so obvious as not to require restatement, but the circumstances of the case—and the parties' competing contentions—demand a brief refresher.  So here goes.)  It is a biological fact that unlike some lower organisms that reproduce asexually through fission, budding, or the like, human beings reproduce sexually.  It is also a biological fact that human sexual

9

reproduction requires, in particular, the involvement of both male and female gametes—sperm and eggs.[4]  It is the successful combination of those two—and only that combination—that produces a human embryo.  Critically here, within the human reproductive process, the male and female bodies have different roles and purposes—each has an activity "for which [it] is specifically fitted, used, or responsible," and thus, in statutory terms, serves a distinct "function."  *Webster's Third, supra*, at 920-21.

The male body's necessary function within the reproductive process is simply stated: it must produce and provide healthy sperm capable of fertilizing a female's egg.  *See* Mayo Clinic Staff, *Male Infertility: Causes*, Mayo Clinic (Aug. 11, 2015), http://www.mayoclinic.org/diseases-conditions/male-infertility/basics /causes/con-20033113.  The female body's function is more robust.  It must first produce and provide at least one healthy egg capable of being fertilized, and then, following successful fertilization, allow that egg to implant in the lining of the uterus, sustain the growth of the embryo to viability, and finally, safely deliver a child.  *See* Mayo Clinic Staff, *Female Infertility: Symptoms and Causes*, Mayo Clinic (Nov. 24, 2016) http://www.mayoclinic.org/diseases-conditions/female-infertility/symptoms-causes/dxc-20214762.

---

[4] The necessary involvement of both a male and a female body in the human reproductive process distinguishes reproduction from other bodily functions to which Mr. Morrissey seeks to analogize.  Digestion and respiration, for instance, are (unlike reproduction) accomplished by a single body without the necessary contribution of another.

10

Traditionally, of course, the fertilization of a female's egg by a male's sperm occurs *in vivo*, or "within the living"—that is, during the act of heterosexual intercourse. Today, through the marvels of modern medicine, fertilization can also be accomplished *in vitro*, or "within the glass," outside the context of sex. *See* Robert W. Rebar, M.D., *Assisted Reproductive Techniques*, Merck Manual, http://www.merckmanuals.com/home/women-s-health-issues/infertility/assisted-reproductive-techniques. There, rather than the sperm and egg being united during intercourse, they are retrieved separately and then either "mixed" in a culture dish or, as happened here, combined by injecting sperm directly into an egg. If successful fertilization occurs, the fertilized egg is incubated for several days and then transferred to the uterus of either the mother or (as here) a gestational surrogate—at which point the female body serves the same reproductive function it would following traditional *in vivo* fertilization: allowing the fertilized egg to implant, sustaining the embryo's growth to viability, and safely delivering a child.

The key point for present purposes is that regardless of the method through which a man exercises his reproductive function—whether inside or (as here) outside the context of heterosexual intercourse, *in vivo* or *in vitro*—he can't reproduce on his own. In either case, a father contributes to the reproductive process by the provision of healthy sperm. His provision of that sperm is a necessary condition to reproduction, but not a sufficient condition; the cooperative

11

involvement of a female body's peculiar reproductive function is also necessary. The bottom line: the male body's distinctive function in the reproductive process is limited and discrete. With the provision (one way or the other) of healthy sperm, the male body's role is complete; it makes no further biological contribution.

Which brings us (at long last) back to the statutory language. As a man, Mr. Morrissey's body's specific responsibility in the reproductive process—his particular reproductive "function"—was to produce and provide healthy sperm. The question here is whether the IVF-related expenses for which Mr. Morrissey claimed tax deductions were paid for care that materially influenced or altered— *i.e.*, "affect[ed]"—that function. Overwhelmingly, they were not.

To be sure, the aspects of the IVF process that related specifically to Mr. Morrissey's provision of healthy sperm could be said to have affected his reproductive function. So, for instance, if the $1,500 that Mr. Morrissey spent on sperm collection and accompanying bloodwork had exceeded the applicable 7.5%-of-AGI threshold, it would have been deductible. But as already explained, it didn't—by a long shot—and so it wasn't.

Mr. Morrissey's claimed deduction—and thus this appeal—turns on the far more significant sums (more than $55,000) that he paid to identify, retain, compensate, and care for the women who served as the egg donor and gestational surrogate. The question is whether *those* expenses were undertaken for treatment

12

or care that materially influenced or altered—affected—Mr. Morrissey's own reproductive function. They weren't. Mr. Morrissey is capable of producing and providing healthy sperm with or without the involvement of an egg donor or a gestational surrogate. His body could perform those functions before he engaged his female counterparts in the IVF process, and he can do so—just the same—after the completion of that process. Because the costs attributable to the identification, retention, compensation, and care of the egg donor and the surrogate weren't incurred "for the purpose of affecting any … function of [Mr. Morrissey's] body," he can't deduct them as "medical care" expenses under I.R.C. § 213.

Our understanding of Section 213's plain language is confirmed by existing Tax Court precedent. That court has consistently rejected efforts by male taxpayers to deduct IVF-related expenses that were paid to cover the care of unrelated female egg donors and gestational surrogates. In *Magdalin v. Commissioner*, for instance, a single man who was not infertile but was (of course) unable to conceive and bear children without a woman's participation sought to claim deductions of IVF-related expenses for an egg donor and a surrogate. 96 T.C.M. (CCH) 491, 2008 WL 5535409 (2008), *aff'd*, 2009 WL 5557509 (1st Cir. 2009). The Tax Court held that the donor- and surrogacy-related IVF processes had not "affected" the taxpayer's body's own structures and functions, which "remained the same before and after those processes." 2008 WL 5535409 at *4

13

n.8.  Affirming, the First Circuit reiterated that the IVF treatments for which the taxpayer had paid were "not for the purpose of affecting any structure or function of [his] body," but rather "affected the bodies of the gestational carriers …." *Magdalin,* 2009 WL 5557509, at *1.

Similarly, in *Longino v. Commissioner*, the Tax Court addressed the deductibility of IVF-related costs that a fertile male taxpayer had incurred on behalf of his fiancée.  105 T.C.M. (CCH) 1491, 2013 WL 1104430 (2013), *aff'd*, 593 Fed. Appx. 965 (11th Cir. 2014).  The court held that the expenses were not deductible because (as relevant here) they were not made for the purpose of affecting the structure or function of the taxpayer's own body.  2013 WL 1104430 at *11.  This Court affirmed on the ground that the Tax Court had found that the taxpayer "had presented no evidence that any of the alleged care involved him, his spouse, or a dependent." *Longino,* 593 Fed. Appx. at 968.[5]

\* \* \*

We are thus constrained by I.R.C. § 213's plain language to reject Mr. Morrissey's statutory claim.  Because the human reproductive process entails distinct male and female functions, because Mr. Morrissey's body's own function

---

[5] Mr. Morrissey seeks to distinguish *Magdalin* and *Longino* on the ground that the taxpayers in those cases "had previously fathered children naturally" and thus had non-IVF means of reproducing.  Br. of Appellant 28.  That may be a distinction—or it may not be, at least with respect to *Magdalin*, in which it appears that the taxpayer might have been homosexual.  Br. of Appellee 21 n.6.  But in any event, the distinction, such as it is, has no particular bearing on the ordinary meaning of the phrase "for the purpose of affecting any … function of the body."

14

within that process is to produce and provide healthy sperm, and because Mr. Morrissey was and remains capable of performing that function without the aid of IVF-related treatments, those treatments did not "affect[]" any "function of [his] body" within the meaning of Section 213(d)—and accordingly do not qualify as deductible "medical care" within the meaning of Section 213(a).

### B

Mr. Morrissey separately contends that by denying his deduction for the IVF-related expenses, the IRS violated his right to equal protection of the laws.[6]

"Equal protection analysis requires strict scrutiny of a legislative classification only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class." *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 312 (1976). Where no fundamental right or suspect class is implicated, courts evaluate equal protection claims under the rational basis test. *Lofton v. Sec'y of Dep't of Children & Family Servs.*, 358 F.3d 804, 818 (11th Cir. 2004).

Mr. Morrissey contends that heightened scrutiny applies here on two separate bases. First, he asserts that we should employ strict scrutiny because the IRS's disallowance of his claimed deduction under I.R.C. § 213 infringes his

---

[6] Although the Fourteenth Amendment's Equal Protection Clause applies by its terms only to the States, the Supreme Court has long recognized that equal protection principles bind the federal government (by what has been termed "reverse incorporation") through the Fifth Amendment's Due Process Clause. *See, e.g.*, *Bolling v. Sharpe*, 347 U.S. 497, 500 (1954).

15

fundamental right to reproduce.  Second, he argues that some form of heightened scrutiny should apply because in disallowing the deduction the IRS discriminated against him on the basis of his sexual orientation.

**1**

A "fundamental" right is one that is "explicitly or implicitly guaranteed by the Constitution."  *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 33 (1973).  Mr. Morrissey contends that the Constitution protects a right to "procreation" that, he says, is broad enough to encompass his claim here.  For support, he relies principally on *Skinner v. Oklahoma*, in which the Supreme Court referred to procreation as "fundamental to the very existence and survival of the [human] race" and as a "basic civil right[] of man," 316 U.S. 535, 541 (1942).  The question we must address is whether there are good grounds for extending *Skinner*'s holding—which invalidated a state statute that required the sterilization of certain criminal offenders—to encompass the circumstance presented here, in which a man asserts a fundamental right to father a child through the use of advanced IVF procedures.

In assessing any claim that a right is "fundamental"—for either substantive due process or equal protection purposes—we must begin with a "'careful description of the asserted right.'"  *Doe v. Moore*, 410 F.3d 1337, 1343 (11th Cir.

16

2005) (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993)).[7]  The pertinent question here, therefore, is not whether the Constitution protects a right to "procreation" generally—the Supreme Court has held that it does, at least in certain circumstances—but rather, more specifically, whether a man has a fundamental right to procreate via an IVF process that necessarily entails the participation of an unrelated third-party egg donor and a gestational surrogate.

Having "carefully descri[bed]" the particular right at issue, we must determine whether it is one of "'those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.'"  *Id.* (quoting *Washington v. Glucksberg,* 521 U.S. 702, 720-21 (1997)).  History and tradition provide no firm footing—let alone "deep[] root[ing]"—for the right that underlies Mr. Morrissey's claim.  To the contrary, IVF, egg donation, and gestational surrogacy are decidedly modern phenomena.  Indeed, not all that long ago, IVF was still (literally) the stuff of science fiction.  *See* Aldous Huxley, *Brave New World* 1 (1932) ("'And this,' said the Director opening the door, 'is the Fertilizing Room.'").  The first IVF-assisted human birth didn't occur until 1978, and it wasn't until the mid to late 1980s that doctors began

---

[7] In determining whether a right is sufficiently "fundamental" to trigger strict equal protection scrutiny, this Court has sensibly sought guidance in substantive due process jurisprudence, in which fundamental-rights issues arise with some frequency.  *See Doe*, 410 F.3d at 1346; *Lofton,* 358 F.3d at 811-18; *Woods v. Holy Cross Hospital*, 591 F.2d 1164, 1173 (5th Cir. 1979).

17

to use gestational surrogates in conjunction with IVF procedures.  *See* Remah Moustafa Kamel, *Assisted Reproductive Technology After the Birth of Louise Brown,* J. Reprod. Infertil. 96, 96-99 (2013), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3799275/.

To be sure, IVF and other assisted reproductive technologies represent revolutionary biomedical advances; they have enabled countless couples to conceive who otherwise couldn't have had children biologically.  But these advances are not without their complexities.  IVF-assisted reproduction involving (as it does here) third-party egg donors and gestational surrogates "raise moral and ethical issues" that can affect multiple, and often divergent, interests—among them, those of biological fathers, egg donors, surrogate mothers, and the resulting embryos.  *See* Rebar, *supra*.  Not surprisingly, the States have tackled IVF- and surrogacy-related issues in very different ways.  To take just one example, the States have adopted a range of positions with respect to surrogacy contracts: some States explicitly sanction them, *see, e.g.*, N.H. Rev. Stat. Ann. 168-B:10; some permit them subject to fairly extensive regulation, *see, e.g.*, La. Stat. Ann. R.S. § 9:2718.1-2720.15; others prohibit them outright, *see, e.g.*, N.D. Cent. Code § 14-18-05; and at least one other criminalizes them, *see, e.g.*, Mich. Comp. Laws Ann. § 722.859.

Were we to confer "fundamental" status on Mr. Morrissey's asserted right to

18

IVF-and-surrogacy-assisted reproduction, we would "'to a great extent, place the matter outside the arena of public debate and legislative action.'"  *Doe*, 410 F.3d at 1343 (quoting *Glucksburg*, 521 U.S. at 720).  Particularly in view of the ethical issues implicated by IVF, egg donation, and gestational surrogacy, as well as the ongoing political dialogue about those issues—and mindful that "guideposts for responsible decisionmaking" in the fundamental-rights area "are scarce and open-ended"—we decline to take that step.  *Id*.

## 2

Mr. Morrissey further asserts that the IRS applied I.R.C. § 213 in a discriminatory manner that disadvantaged him on the basis of his sexual orientation.  In so arguing, Mr. Morrissey asks us to decide whether sexual orientation is a suspect (or quasi-suspect) class and, if so, what level of equal-protection scrutiny should apply.  However weighty and interesting those questions may be, we find it unnecessary to address them.

All agree that Section 213 is neutral on its face—as relevant here, it deals with heterosexual and homosexual taxpayers on equal terms.  Accordingly, in order to prevail on his equal protection claim, Mr. Morrissey must establish both (1) that he "was treated differently than similarly situated persons" and (2) that the IRS "unequally applied the facially neutral statute for the purpose of discriminating against" him on the basis of his sexual orientation.  *Strickland v. Alderman,* 74

F.3d 260, 264 (11th Cir. 1996); *see also Sweet v. Sec'y, Dep't of Corr.,* 467 F.3d 1311, 1318-19 (11th Cir. 2006) (the plaintiff "must demonstrate that (1) he is similarly situated to other[s] . . . who received more favorable treatment; and (2) the state engaged in invidious discrimination against him based on race, religion, national origin, or some other constitutionally protected basis."). On the record before us, Mr. Morrissey can't make either showing.

**a**

As a threshold matter, Mr. Morrissey can't demonstrate that the IRS has treated him differently from similarly situated heterosexual taxpayers who claimed deductions of IVF-related expenses under Section 213. The agency's disallowance of Mr. Morrissey's claimed deduction is consistent with longstanding IRS guidance and analogous Tax Court precedent.

As a matter of both policy and practice, the IRS has consistently refused deductions sought by heterosexual taxpayers for IVF-related expenses similar to Mr. Morrissey's. An IRS guidance published in 2002 advised that "medical expenses paid for a surrogate mother and her unborn child would not qualify for deduction under § 213(a)." IRS INFO 2002-0291, 2002 WL 31991849 (Dec. 31, 2002). That guidance comports with the IRS's disallowance of the surrogacy-related deductions sought by taxpayers in the *Longino* and *Magdalin* cases, already

20

discussed.[8]  Indeed, the IRS has refused to allow heterosexual men to deduct the costs of pregnancy-related medical care for their non-spouse female partners and their unborn children, even where the taxpayers fathered the children through natural intercourse.  *See Presby v. Comm'r*, 69 T.C.M. (CCH) 2648 (1995); *Peacock v. Comm'r*, 37 T.C.M. (CCH) 177 (1978).

In the face of this evidence, Mr. Morrissey nonetheless repeatedly asserts that the "IRS ha[s] long permitted heterosexual couples to deduct expenses for fertility treatments, including IVF."  Br. of Appellant at 5; *see also id.* at 10, 18, 23, 29, 35.  But the only support that he offers for that assertion is the IRS's settlement of two individual cases in which heterosexual couples disputed the disallowance of their deductions of surrogacy and egg-donor expenses.  *See Sedgwick v. Comm'r*, No. 10133-94, (T.C. filed June 14, 1994); *Osius v. Comm'r*, No. 15472-11S (T.C. filed June 30, 2011).  Of course, courts don't consider settlements as evidence of the validity of underlying claims, *see* Fed. R. Evid. 408—and the fact that the IRS settled *two* IVF-related disputes in the last 23 years (during which time thousands upon thousands of babies were conceived using artificial reproductive technologies) doesn't establish a pattern of different

---

[8] The IRS has permitted deductions for expenses related to a third-party egg donor where the resulting embryo is implanted in a taxpayer's own body or a taxpayer's spouse's body, on the ground that the implantation "affect[s] the structure or function" of the taxpayer's or spouse's body within the meaning of Section 213(a).  PLR 200318017 (IRS PLR), 2003 WL 2009141 (Jan. 9, 2003).  Mr. Morrissey is differently situated, as the donated eggs were not implanted in—and thus did not affect the structure or function of—either his or his spouse's body.

treatment, in any event.[9]

**b**

Even if Mr. Morrissey could show that he had been treated differently from similarly situated heterosexual taxpayers, he hasn't shown that any difference was motivated by an intent to discriminate against him on the basis of his sexual orientation. *See Strickland,* 74 F.3d at 264.

To make out an equal protection claim, a plaintiff must prove purposeful, intentional discrimination—and to do that, he must prove that the governmental decisionmaker acted as it did "because of, and not merely in spite of, its effects upon an identifiable group." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979); *accord, e.g.*, *Jones v. White,* 992 F.2d 1548, 1573 (11th Cir. 1993). Neither of the two pieces of evidence to which Mr. Morrissey points demonstrates that the IRS purposefully discriminated against him because he is homosexual.

First, Mr. Morrissey asserts that the IRS's refusal to permit him to deduct even the $1,500 attributable to his own biological contributions to the IVF process—the costs associated with testing his blood and collecting his sperm—evince an intent to discriminate against him. That is incorrect. As already explained, it is undisputed that without allowance of the deductions for the far

---

[9] Deborah L. Cohen, *Surrogate Pregnancies on Rise Despite Cost Hurdles* (March 18, 2013), www.reuters.com/article/us-parent-surrogate-idUSBRE92H11Q20130318 (reporting that in 2011 alone—the tax year at issue here—1,593 babies were born to surrogates in the United States).

22

more significant expenses attributable to identifying, retaining, compensating, and caring for the women who served as the egg donor and the gestational surrogate, Mr. Morrissey's medical-care expenses would not have exceeded (or even come close to) I.R.C. § 213's then-prevailing 7.5%-of-AGI deductibility threshold. Purposeful discrimination certainly can't be said to exist in the disallowance of deductions that, for reasons having nothing to do with any protected characteristic, weren't properly deductible.

Second, as evidence of what he contends is anti-homosexual bias, Mr. Morrissey alludes (albeit briefly) to a remark in the initial audit report of IRS agent Gary Shephard. Shephard's internal memorandum recommended that the IRS disallow Mr. Morrissey's IVF-related deduction both because "the [taxpayer] did not have the *in vitro* fertilization procedure performed on himself, his spouse, or dependent" and because "there was no medical condition that would require this procedure." With respect to the second ground, Shephard observed that "the taxpayer does have the ability to have children with a member of the opposite sex but, not the same sex," and that "[t]he taxpayer's decision not to have children with a member of the opposite sex is a personal choice and not a medical condition." Mr. Morrissey assails Shephard's suggestion that his sexual orientation represents a "personal choice" as evincing discriminatory intent that impugns the IRS's decision.

23

Although we tend to think that Mr. Morrissey may be over-reading what seems to have been an innocent (if ill-phrased) remark, we needn't wrestle with the issue here because Shephard's report wasn't the IRS's final or official word on Mr. Morrissey's claimed deduction.  In the IRS's formal claim-disallowance letter, the Supervisory Revenue Agent explained, simply and without any trace of bias—or for that matter, any recognition of Mr. Morrissey's sexual orientation, one way or the other—that I.R.C. § 213 limits medical-expenses deductions to "Medical Services provided to the taxpayer, his spouse, or dependent."  In affirming that determination, the IRS Office of Appeals likewise concluded—again, flatly, and without any suggestion of discriminatory purpose—that "existing law does not allow" Mr. Morrissey's IVF-related deduction.  Because there is no evidence that the IRS's actual decisionmakers engaged in any intentional discrimination, Mr. Morrissey's equal protection claim fails.[10]

### III

We hold (1) that the Internal Revenue Code does not permit Mr. Morrissey to deduct the expenses attributable to the identification, retention, compensation,

---

[10] Mr. Morrissey separately complains that, in operation, I.R.C. § 213's burden falls more heavily on him than on heterosexual taxpayers because the statute disallows him a deduction for his only means of achieving biological procreation.  That sort of "disparate impact" theory, while sufficient under some civil rights statutes, *see, e.g.*, *Texas Dep't of Hous. & Comty. Affairs v. Inclusive Communities Project Inc.*, 135 S. Ct. 2507, 2525 (2015), will not support an equal protection claim.

and care of the women who served as the egg donor and the gestational surrogate in his IVF process, and (2) that the IRS's disallowance of Mr. Morrissey's claimed deduction neither violates any fundamental right nor discriminates on the basis of any suspect (or quasi-suspect) characteristic.  Accordingly, we affirm the district court's order granting summary judgment and dismissing Mr. Morrissey's claims.

**AFFIRMED**.