**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 25-14325
Non-Argument Calendar
_____

STACEY IAN HUMPHREYS,

*Plaintiff-Appellant,*

*versus*

COMMISSIONER, GEORGIA DEPARTMENT OF
CORRECTIONS,
ATTORNEY GENERAL, STATE OF GEORGIA,
WARDEN, GEORGIA DIAGNOSTIC AND CLASSIFICATION
PRISON,

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:25-cv-06100-LMM
_____

Before WILLIAM PRYOR, Chief Judge, and ROSENBAUM and
NEWSOM, Circuit Judges.

2                    Order of the Court                    25-14325

BY THE COURT:

In 2006, a Cobb County Superior Court jury found Plaintiff-Appellant Stacey Ian Humphreys guilty of two counts of malice murder, two counts of felony murder, two counts of aggravated assault, two counts of kidnapping with bodily injury, and two counts of armed robbery. The same jury found several statutory aggravating circumstances applied and recommended a sentence of death.

The trial court agreed and imposed a death sentence for each murder, along with sentences of imprisonment for Humphreys's other convictions. Humphreys then exhausted his direct appeals and collateral review. Given the status of Humphreys's challenges to his convictions and sentences, the State of Georgia obtained a warrant on December 1, 2025, for Humphreys's execution. His execution is scheduled for December 17, 2025.

Meanwhile, before the execution warrant issued, Humphreys filed an action under 42 U.S.C. § 1983, alleging his execution would violate his equal-protection and due-process rights under the Fifth and Fourteenth Amendments. He based his claims on Georgia's written agreement with, among others, the Federal Defender Program, Inc. ("Federal Defender"), to not resume executions until after certain conditions related to the COVID-19 pandemic are satisfied. And Georgia courts have held that the agreement likely hasn't been fully satisfied.

But there's a catch. By its terms, the agreement applies to only those inmates whose final appeal in the Eleventh Circuit

concluded during Georgia's COVID-19 judicial emergency. Humphreys falls outside that group. We denied Humphreys's last petition for rehearing more than three years after the Chief Justice of the Georgia Supreme Court lifted the final COVID-19 judicial emergency order.

In Humphreys's view, the agreement's classification of which inmates are covered and which are not violates the Equal Protection and Due Process Clauses. So in the district court, Humphreys moved to enjoin his execution based on those constitutional concerns. Humphreys also sought a temporary restraining order or preliminary injunction enjoining his execution until his claims were resolved. The district court held a hearing on Humphreys's claims and denied them.

Now, Humphreys seeks an emergency stay of his execution pending resolution of his appeal of the district court's order dismissing his § 1983 claims. Because Humphreys has not established that he is substantially likely to succeed on his appeal, we deny his motion.

## I.    BACKGROUND

We have previously set forth the facts on Humphreys's crimes, convictions, and appeal history. *See Humphreys v. Warden, Ga. Diagnostic Prison*, No. 21-10387, 2024 WL 2945070, *1–9 (11th Cir. June 11, 2024), *cert. denied sub nom. Humphreys v. Emmons*, 607 U.S. ___, 2025 WL 2906475 (Mem.) (Oct. 14, 2025). Because they are not directly relevant to the legal challenge before us and

4                    Order of the Court                    25-14325

because of time constraints, we do not repeat them here. Rather, we focus on the background underlying Humphreys's § 1983 claims.

### A. The Agreement

In May 2020, the Chief Justice of the Georgia Supreme Court established a task force on "measures to address the challenges facing the courts and affected parties as a result of the COVID-19 pandemic." *State v. Fed. Def. Program, Inc.*, 882 S.E.2d 257, 265 (Ga. 2022). Among other issues, the task force set out to address "the capital defense bar's concerns about how the restrictions necessitated by COVID-19 had resulted in a backlog of execution-eligible inmates." *Id.*[1] As the defense bar explained, the significant backlog had both "hindered capital defense counsel's ability to prioritize clemency investigations for a growing number of inmates eligible for execution" and had "impaired counsel's ability to meet with their clients and conduct investigations in order to prepare for clemency proceedings and adequately represent their clients." *Id.*

To address this concern, Georgia's Deputy Attorney General of its Criminal Justice Division agreed with the capital-defense

---

[1] The Georgia Supreme Court explained that a death-sentenced prisoner becomes "execution-eligible" when he has exhausted his appeals upon the U.S. Supreme Court's denial of certiorari on his federal habeas appeal. *Fed. Def. Prog.*, 882 S.E.2d at 266 n.4. The State may then seek a judicial order, commonly called an "execution warrant," authorizing the prisoner's execution.

25-14325                Order of the Court                5

bar not to seek execution warrants for certain execution-eligible defendants until three conditions were satisfied. An email from the State ("Agreement") set out those conditions:

> [The Criminal Justice Division] will not pursue an execution warrant from the District Attorney in the below defined cases before: 1) the final COVID19 judicial emergency order entered by the Chief Justice of the Supreme Court of Georgia expires; 2) the Georgia Department of Corrections lifts its suspension of legal visitation, and normal visitation resumes; and 3) a vaccination against COVID19 is readily available to all members of the public.

*Id.* at 266 (brackets omitted). The Attorney General's Office also generally agreed "not [to] pursue an execution warrant of any prisoner . . . before a total of at least six months after" all three conditions in the Agreement were satisfied. *Id.*

But this Agreement applied to only "death-sentenced prisoners whose petition for rehearing or rehearing en banc was denied by the Eleventh Circuit while the State of Georgia remained under judicial emergency order." *Id.* And that period lasted from March 14, 2020, through June 30, 2021 ("COVID-19 Emergency Period"). *Id.* at 265 n.3.

  B.  State v. Federal Defender Program*, 882 S.E.2d 257 (Ga. 2022)*

In 2022, Georgia obtained an execution warrant for Virgil Presnell, an execution-eligible prisoner whose petition the

Eleventh Circuit denied during the COVID-19 Emergency Period. *Id.* at 266, 279 n.15.  The Federal Defender responded by filing a complaint against Georgia alleging a breach of the Agreement.  *Id.* at 267.  Georgia courts, including the Georgia Supreme Court on review, determined that the Federal Defender had shown a substantial likelihood that the Agreement was valid and binding.  *See id.* at 269–81.  They also held that the second and third conditions of the Agreement—that the Georgia Department of Corrections resumes its normal visitation and that a COVID-19 vaccine is "readily available to all members of the public"[2]—were likely not satisfied when Georgia obtained an execution warrant for Presnell.  *See id.* at 285–86.  And because the Eleventh Circuit denied Presnell's petition during the COVID-19 Emergency Period, the courts concluded, the Agreement bound the State with respect to his execution.  *See id.* at 267, 279 n.15.

Then, in May 2025, a Georgia trial court permanently enjoined State officials from seeking execution warrants against Covered Inmates.  Order, *Fed. Def. Program, Inc. v. State of Georgia*, No. 2022CV364429 (Ga. Super. Ct. May 29, 2025).  The court concluded that, at a minimum, the vaccination condition is not satisfied because the COVID-19 vaccine is not readily available for children

---

[2] "[C]hildren under the age of five still were not eligible for any COVID-19 vaccine." *Fed. Def. Program*, 882 S.E.2d at 285.

under six months old.  *Id.* at 10.[3]  The State has appealed that decision to the Georgia Supreme Court.[4]

### C.  Proceedings in the District Court

On October 24, 2025, Humphreys filed this action in the district court.  As we've explained, he alleged that Georgia cannot execute him without violating his rights to equal protection and due process under the Fifth and Fourteenth Amendments.  In Humphreys's view, with the Agreement, the State has created two classes of execution-eligible prisoners:  those who are subject to the Agreement and those who aren't, and the only difference between the situations of the two is when the Eleventh Circuit ruled on the prisoners' collateral-review petitions.  Humphreys argued that classification is arbitrary.  He also contended that the State's failure to provide him with the same protections as those covered by the Agreement violates due process.

Soon after filing his complaint, Humphreys moved for a stay of proceedings pending the Eleventh Circuit's ruling in *Pace v. Oliver*, another case that raised the same claims on behalf of other prisoners sentenced to death.  The district court hearing that case dismissed it after determining the plaintiffs lacked standing because

---

[3] Based on bifurcation of the case, the trial court did not reach the question of whether the second condition is satisfied.  Order at 2 n.1, *Fed. Def. Program*, No. 2022CV364429 (Ga. Super. Ct. May 30, 2025).

[4] Georgia doesn't argue in the instant case that the second and third conditions of the Agreement have since been satisfied.

they hadn't yet had warrants for their executions issued. *Pace v. Oliver*, 749 F. Supp. 3d 1304, 1316–17 (N.D. Ga. 2024). The *Pace* plaintiffs appealed, and the Eleventh Circuit heard oral argument in that case, which remains pending.

While Humphreys's motion to stay proceedings until the resolution of *Pace* was pending, the State moved to dismiss Humphreys's case for failure to state a claim. Then, on December 1, 2025, the State obtained a warrant for Humphreys's execution. So on December 5, Humphreys moved for a temporary restraining order or preliminary injunction preventing his execution. He based his motion on the same premises as his original complaint: that the State had violated his rights to equal protection and due process under the Fifth and Fourteenth Amendments.

On December 10, The district court heard argument on the State's motion to dismiss and Humphreys's motion for a temporary restraining order or preliminary injunction. Later that same day, the district court issued an order denying Humphreys's motions for stay and for a temporary restraining order or preliminary injunction and granting the State's motion to dismiss. And the next day, the court entered judgment dismissing the case.

Humphreys appealed.

On December 12, 2025, he filed an emergency motion for an order staying execution pending appeal. In support of his motion, Humphreys argues he is substantially likely to succeed on the merits of his appeal. That is, he asserts that the State has violated his equal-protection and due-process rights under the Fifth and

Fourteenth Amendments. He also contends that the other stay factors—irreparable injury in the absence of a stay, no substantial harm to the State, and a lack of adversity to the public interest—favor him. We consider Humphreys's emergency motion below.

## II.    LEGAL STANDARD

To obtain a stay of his execution pending appeal, Humphreys must show that "(1) he has a substantial likelihood of success on the merits" of his appeal, "(2) he will suffer irreparable injury unless the injunction issues; (3) the stay would not substantially harm the other litigant; and (4) if issued, the injunction would not be adverse to the public interest." *James v. Sec'y, Dep't of Corr.*, 130 F.4th 1291, 1295 (11th Cir. 2025) (quoting *Valle v. Singer*, 655 F.3d 1223, 1225 (11th Cir. 2011)), *cert. denied sub nom. James v. Dixon*, 145 S. Ct. 1351 (2025).

## III.    DISCUSSION

Humphreys argues that he has shown a substantial likelihood of success on his appeal of the district court's rulings on both his Equal Protection and Due Process Clause claims. We address each claim in turn.

Then, we briefly assess Humphreys's showing on the other three stay factors: whether Humphreys will suffer irreparable harm absent a stay, the balance of harms, and the public interest.

### A. Equal Protection

Humphreys contends that the State's disparate treatment of two sets of death row prisoners violates the Equal Protection Clause. [**Br. at 5.**] The first set is death-sentenced prisoners for whom the Eleventh Circuit denied rehearing on their final habeas appeal during Georgia's COVID-19 Emergency Period, which ended on June 30, 2021 (the "Covered Inmates"). The second set, which includes Humphreys, consists of the inmates whose final appeals in the Eleventh Circuit finished after June 30, 2021 (the "Noncovered Inmates).

In considering Humphreys's claim, we engage in a two-step analysis. Humphreys "must first show that 'the State will treat him disparately from other similarly situated persons.'" *Price v. Comm'r, Dep't of Corr.*, 920 F.3d 1317, 1323 (11th Cir. 2019) (quoting *Arthur v. Thomas*, 674 F.3d 1257, 1262 (11th Cir. 2012)). If he does, at the second step, we determine and apply the appropriate tier of scrutiny. Courts subject a classification to heightened scrutiny only if it implicates a fundamental right or targets a suspect or quasi-suspect class. *See Jones v. Governor of Fla.*, 975 F.3d 1016, 1029 (11th Cir. 2020) (en banc). If heightened scrutiny doesn't apply, Humphreys "must show that the disparate treatment is not rationally related to a legitimate government interest." *Price*, 920 F.3d at 1323 (quoting *DeYoung v. Owens*, 646 F.3d 1319, 1327–28 (11th Cir. 2011)).

### 1. Disparate Treatment of Similarly Situated Persons

To start with, Humphreys has shown that the State is treating similarly situated people dissimilarly. Prisoners in both classes

25-14325                    Order of the Court                    11

are execution-eligible, in that they have completed their postconviction appeals. So but for the Agreement at issue in this case, then, the State is equally entitled to move forward with obtaining an execution warrant for prisoners in either group.

Despite that similarity, the State has agreed not to seek execution warrants for the Covered Inmates. But it has obtained an execution warrant for Humphreys and executed at least one other member of the Non-covered Inmates.[5]

Equal-protection analysis applies to this disparate treatment. To explain why, two points bear emphasis.

First, Humphreys and the Covered Inmates are similarly situated. The State contends that Humphreys's circumstances are dissimilar to those of the Covered Inmates because he is "excluded as a party to the Agreement by its plain terms." But that circular reasoning misses the point. The equal-protection question asks whether the distinction between the two classes rationally relates to a legitimate government interest. In other words, the whole

_____

[5] The state obtained an execution warrant for William James Pye on February 29, 2024, and executed him on March 20, 2024. Shortly before his execution, Pye sued a collection of state officials in federal district court based on similar constitutional arguments to the ones Humphreys asserts in this case. *See Pye v. Oliver*, No. 3:24-CV-48-TCB, 2024 WL 1173742, at *3–9 (N.D. Ga. Mar. 15, 2024). The district court dismissed his complaint for failure to state a claim. *Id.* at *10. The Eleventh Circuit affirmed without reaching the merits of Pye's claims, relying on alternative grounds of res judicata because Pye had already litigated similar claims in state court. *See Pye v. Comm'r, Ga. Dep't of Corr.*, No. 24-10793, 2024 WL 1201741, at *2 (11th Cir. Mar. 19, 2024).

point is to decide whether the date a prisoner's appeal concludes is a valid reason to exclude him from the Agreement's procedural guarantees. The distinction the State draws can't be its own justification.

And second, we are talking about a *governmental* distinction between the two classes of prisoners. The State writes at length about how capital defense attorneys participated in the negotiations leading to the Agreement. But so what? To be sure, Humphreys must allege that "*through state action*, similarly situated persons have been treated disparately." *Draper v. Reynolds*, 369 F.3d 1270, 1278 n.14 (11th Cir. 2004) (emphasis added and quotation marks omitted)). But the fact that the State's compliance with the Agreement it voluntarily entered serves as the basis for its disparate treatment of the Covered and Non-covered Inmates makes no difference to the bottom line: the State is treating similarly situated people differently. And the State chose to bind itself in the Agreement to engage in and to refrain from engaging in particular actions.

The Equal Protection Clause has no per se exception for contractual agreements with private entities. *See, e.g.*, *Price v. City of Chicago*, 251 F.3d 656, 661 (7th Cir. 2001) (analyzing, under the Equal Protection Clause, the "City's practice of using date of birth to determine seniority[, which] is memorialized in a collective bargaining agreement between the City and the Fraternal Order of Police"); *Green v. Waterford Bd. of Ed.*, 473 F.2d 629, 633, 636 (2d Cir. 1973) (holding that a contractual term mandating maternity leave

without pay for pregnant workers, contained in a collective-bargaining agreement between town school board and a labor organization, violated the Equal Protection Clause).

And our conclusion remains the same even if we assume that acquiescing to a private party's contractual demands can, in some circumstances, make disparate treatment not attributable to state action. Here, the State proposed the key distinction. Its April 14, 2021, email was the first to limit the entire contract's reach "only to death-sentenced prisoners whose petition for rehearing or rehearing en banc was denied by the Eleventh Circuit while the State of Georgia remained under judicial emergency order." The draft memorandum of understanding that a capital defense bar attorney had previously circulated was broader. It would have barred the State from seeking an execution warrant for *any* prisoner until all three conditions were met. Only one provision, which required the State to wait a minimum period between seeking each execution warrant, applied to the narrower set.

Without more, the government cannot avoid the Equal Protection Clause's guarantees simply by creating a classification with a contract.

### 2. Rational-basis Review

Next, we determine and apply the appropriate level of scrutiny. Rational-basis review applies in this case, and the State satisfies that deferential standard.

Humphreys asserts that heightened scrutiny applies for one of two reasons, but neither is convincing. Humphreys first argues

that the classification infringes his "fundamental right to life" and thereby triggers strict scrutiny.

We determine whether an asserted right is fundamental—and therefore merits strict scrutiny—in two steps. "[W]e must begin with a 'careful description of the asserted right.'" *Morrissey v. United States*, 871 F.3d 1260, 1269 (11th Cir. 2017) (quoting *Doe v. Moore*, 410 F.3d 1337, 1343 (11th Cir. 2005)). Then, we must determine whether that right "is one of 'those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty.'" *Id.* (quoting *Doe*, 410 F.3d at 1343).

Humphreys has not advanced a carefully defined, fundamental right. He contends that, as a death-sentenced prisoner, his "right to continue living" for even one additional day warrants strict scrutiny. Yet he provides no authority for that view. To be sure, he invokes Justice O'Connor's precedential opinion in *Ohio Adult Parole Authority v. Woodard*.[6] But that opinion states only that a death-sentenced prisoner has "an interest in his life" that warrants "some *minimal* procedural safeguards" in clemency proceedings. *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 289 (1998) (O'Connor, J., concurring in part). Nothing in Justice O'Connor's opinion suggests this right is a fundamental one that calls for strict scrutiny.

---

[6] Justice O'Connor's concurring opinion provided the holding in *Woodard*. *Gissendaner v. Comm'r, Ga. Dep't of Corr.*, 794 F.3d 1327, 1331 (11th Cir. 2015).

The logical conclusion of Humphreys's position proves the point. Under his theory, every scheduling order or denial of a motion for a continuance in a death-penalty case would implicate a fundamental right and warrant strict scrutiny. That is not the law.

Humphreys's second argument for heightened scrutiny also fails. It rests on *M.L.B. v. S.L.J.*, 519 U.S. 102 (1996). In that case, the Supreme Court considered mandatory fees a parent had to pay to challenge termination of her parental rights over her minor children. *Id.* at 107. The Court concluded that parental rights are among the "[c]hoices about marriage, family life, and the upbringing of children" that are of such "basic importance" to society that they deserve heightened scrutiny. *Id.* at 116. This case is quite different. Humphreys lacks any authority that calls for extending *M.L.B.* beyond the context of "family association."

Because Humphreys's claims do not warrant heightened scrutiny, we apply the rational-basis test. *Morrissey*, 871 F.3d at 1268. To survive rational-basis review, a classification must be only "rationally related to some legitimate government interest." *Jones*, 975 F.3d at 1034. And we sustain the government's action if "there is any reasonably conceivable state of facts that could provide a rational basis" for it. *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). This is a deferential standard, but it's not "toothless." *Deen v. Egleston*, 597 F.3d 1223, 1230 (11th Cir. 2010).

The State asserts that treating the two sets of inmates differently rationally relates to two governmental interests. Those are, first, ensuring that death-row prisoners and their counsel could

16                    Order of the Court                    25-14325

adequately prepare for clemency proceedings and, second, ensuring that the State can carry out criminal penalties in a timely manner.

Both are legitimate government interests.  We agree that assuring fair procedures for citizens' dealings with the government is a legitimate interest, particularly in the criminal legal system.  *Cf. J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 137 n.8 (1994) ("The State's interest in every trial is to see that the proceedings are carried out in a fair, impartial, and nondiscriminatory manner.").  And the State "obviously has a strong interest in enforcing its criminal laws," which encompasses its "ability to implement a lawfully imposed death sentence." *Jordan v. Comm'r, Mississippi Dep't of Corr.*, 947 F.3d 1322, 1340 (11th Cir. 2020).

The State's disparate treatment of Humphreys and the Covered Inmates rationally relates to these two interests.  Particularly at the time the State entered into the Agreement, it was more than reasonable to think that the inmates whose appeals finished during the COVID-19 Emergency Period would face the greatest risk of impaired clemency proceedings and pre-execution litigation.  Extending additional notice and procedural guarantees to those prisoners addressed the greatest need.[7]

---

[7] The draft memorandum of understanding also recognized that the parties "d[id] not wish to be overwhelmed with protracted litigation concerning counsel's inability to prepare for clemency proceedings."  The State could sensibly have believed that litigation by prisoners whose clemency hearings came

25-14325                Order of the Court                17

But meanwhile, the State's interest in carrying out criminal penalties, including death sentences, is also legitimate. And the line the State drew in the Agreement helped to further that interest. The parties were addressing the severe restrictions prisoners and their counsel faced at the height of the COVID-19 pandemic. But in 2021, the State couldn't know precisely when a court would consider the Agreement's visitation and vaccination conditions to be satisfied. (Indeed, the State may be surprised that it is still litigating the issue in state court four-and-a-half years later.) Restricting the Agreement to inmates who exhausted their appeals during the COVID-19 Emergency Period put a rational limit on the potential unexpected effects of the Agreement.

Today's circumstances bear out the rationality of that choice. Over four years after the COVID-19 Emergency Period ended, life has returned to a more normal state. Even so, Georgia courts have determined that there's a likelihood that the Covered Inmates could establish that two of the conditions of the Agreement have not yet been satisfied.

Still, the State has a legitimate interest in carrying out its legally imposed criminal sentences, especially when they have been pending for so long. Without the distinction in the Agreement, that interest would be completely frustrated, as to all death-sentenced prisoners. If that were a risk of entering the Agreement, the State might reasonably have refused to make any guarantee of

_____

at the height of COVID-19-related restrictions could be particularly contentious.

18                    Order of the Court                    25-14325

procedural adequacy.  So the State may proceed with executions of individuals whose appeals were exhausted after the COVID-19 Judicial Emergency, whose executions the Agreement does not purport to prohibit.

Ultimately, then, the Agreement's classification rationally relates to both legitimate government interests.  A State official could believe that the classification promoted the State's interests in ensuring procedural fairness (and avoiding litigation about inadequate procedure) while minimizing the possible threat to its interest in expeditiously carrying out death sentences.  The rational basis test requires no more.

### B.  Due Process

Humphreys also makes a procedural-due-process claim.  He contends that the State's efforts to execute him without the procedural guarantees the Agreement offers to Covered Inmates violates the Fourteenth Amendment's Due Process Clause.  But Humphreys doesn't allege constitutionally inadequate process.  So this claim cannot succeed.  As a result, Humphreys hasn't shown a substantial likelihood of success on his appeal of this claim, either.

To succeed on a procedural-due-process claim, a plaintiff must show "(1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *Howard v. Coonrod*, 134 F.4th 1136, 1149 (11th Cir. 2025) (quoting *Resnick v. KrunchCash, LLC*, 34 F.4th 1028, 1035 (11th Cir. 2022)).

25-14325                 Order of the Court                    19

Humphreys asserts two liberty interests.  We consider each, in turn, under the procedural-due-process framework.

First, Humphreys invokes a federally protected liberty interest in his clemency proceedings.  That interest finds support in Justice O'Connor's binding opinion in *Woodard*, 523 U.S. at 289 (O'Connor, J., concurring).  Her opinion recognizes "a due process interest in the context of state clemency proceedings for death row inmates." *Gissendaner v. Comm'r, Ga. Dep't of Corr.*, 794 F.3d 1327, 1331 (11th Cir. 2015).  And to the extent that Humphreys feels he had inadequate time to prepare for clemency or pre-execution litigation, it was state action that so deprived him.

But the interest *Woodard* recognizes requires only "some *minimal* procedural safeguards." *Woodard*, 523 U.S. at 289 (O'Connor, J., concurring); *see Gissendaner*, 794 F.3d at 1331.  For that reason, Humphreys hasn't satisfied the third element of his procedural-due-process claim.  He hasn't shown how the clemency proceedings available to him are constitutionally inadequate.

*Woodard* is instructive.  There, the prisoner received just three days' notice of his clemency interview, and his attorney was excluded from the interview. *Woodard*, 523 U.S. at 289 (O'Connor, J., concurring).  The prisoner also received only ten days' notice of his clemency hearing and was "precluded from testifying or submitting documentary evidence." *Id.*  None of those facts posed a constitutional problem. *Gissendaner*, 794 F.3d at 1331 (11th Cir. 2015) (discussing *Woodard*).

Here, Humphreys had at least fourteen days' notice of his clemency hearing, which is scheduled for December 16, 2025. He hasn't presented this Court with any reason why he can't fully make his case for clemency on that date.[8]

Second, Humphreys contends that he has a state-created liberty interest in adequate representation for clemency proceedings and pre-execution litigation. He asserts that the Agreement created a state liberty interest in adequate representation for all death-row prisoners.

Even assuming without deciding that Humphreys has a liberty interest in the Agreement's procedural guarantees, his claim fails. Again, the third element of a procedural-due-process claim requires a showing of *constitutionally inadequate* process. Humphreys's brief recognizes this requirement. But neither his complaint nor his submission to this Court identifies any impediment to his ability to pursue clemency or pre-execution litigation. His allegation that "[l]egal visitation to death row prisoners remains severely restricted, as compared to the pre-pandemic conditions" isn't

---

[8] In district court, Humphreys submitted an affidavit from a prior counsel, Jill Benton, suggesting that the timing of his clemency hearing would prevent the "ideal advocate" for Humphreys from participating. Benton asserted that this ideal advocate, the trial counsel for Humphreys's original hearing, is intimately familiar with the alleged jury misconduct in Humphreys's trial, which led several Justices to dissent from denial of certiorari. *Humphreys v. Emmons*, No. 24-826, 607 U.S. ___, 2025 WL 2906475, at *1 (U.S. Oct. 14, 2025) (Sotomayor, J., dissenting). Humphreys hasn't made any argument to this Court about his trial counsel's inability to participate.

enough. He doesn't explain how limited visitation has affected his preparation for clemency or pre-execution litigation.

The Due Process Clause mandates "fundamental fairness." *Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987). We cannot say that the process available to Humphreys falls below that line.

### C. Additional Stay Factors

#### 1. Irreparable Injury

As Humphreys emphasized, it is "self-evident" that a death-sentenced inmate will suffer an irreparable injury if the State carries out his execution. *See In re Holladay*, 331 F.3d 1169, 1177 (11th Cir. 2003). But that is true of every motion for a stay of execution. Humphreys must show how he will be irreparably injured by the denial of the procedures in the Agreement, not injured as a consequence of his original criminal conviction and sentence. The irreversible nature of the death penalty cannot, on its own, justify a stay.

#### 2. Balance of Harms

Neither of Humphreys's arguments about the balance of harms tips this factor in his favor. Humphreys argues that refraining from an unconstitutional execution cannot harm the State. But that argument relies on the strength of Humphreys's merits arguments. And as we've discussed, he's failed to make a showing on the substantial-likelihood-of-success factor. So a stay would harm the State's interest in timely enforcement of its criminal sentences. *See Hill v. McDonough*, 547 U.S. 573, 584 (2006).

Humphreys also asserts that he should not be penalized for waiting until the U.S. Supreme Court denied certiori on his habeas appeal before filing this litigation.  He notes that another court in the Northern District of Georgia had ruled a prisoner lacked standing when he filed nearly identical litigation while his petition for certiorari was pending.[9]  Still, this argument can't help Humphreys tip this factor in his direction.  Even assuming he acted with the utmost diligence, he hasn't given any reason that the balance of harms favors him.

### 3.  Adversity to the Public Interest

On the public-interest factor, too, Humphreys's failure on the merits undermines his argument.  Humphreys invokes the public's interest in ensuring that government officials comply with the U.S. Constitution.  That's surely a weighty interest.  But Humphreys hasn't made a meaningful showing that his execution would violate the Constitution.  And the U.S. Supreme Court instructs that, besides the State, "the victims of crime have an important interest in the timely enforcement of a sentence."  *Hill*, 547 U.S. at 584.  That is enough for the public interest to weigh against a stay.

---

[9] Our Court is weighing an appeal of that decision.  *See Pace v. Comm'r, Ga. Dep't of Corr.*, No. 24-13973 (11th Cir. argued Oct. 20, 2025).

## IV.    CONCLUSION

Humphreys has failed to show a substantial likelihood of success on his appeal.  He also hasn't established that the second, third, or fourth stay factors support a stay.

For these reasons, Humphreys's emergency motion for stay of execution pending appeal is **DENIED**.