[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-12948
Non-Argument Calendar
_____

D.C. Docket No. 1:16-cv-02582-RWS


RICHARD JORDAN,
RICKY CHASE,

                                                      Plaintiffs-Appellants,

versus

COMMISSIONER, MISSISSIPPI DEPARTMENT OF CORRECTIONS,

                                                             Defendant,

GEORGIA DEPARTMENT OF CORRECTIONS,

                                                      Movant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(January 10, 2020)

Before WILLIAM PRYOR, TJOFLAT, and JULIE CARNES, Circuit Judges.

## ON PETITION FOR REHEARING

JULIE CARNES, Circuit Judge:

We vacate and reconsider our original opinion in this matter, reported at 908 F.3d 1259. We substitute in its place the following opinion.

Plaintiffs Richard Jordan and Ricky Chase, Mississippi death row inmates, served the Georgia Department of Corrections ("GDC") with a subpoena directing the GDC to testify at a Rule 30(b)(6) deposition and to produce documents concerning Georgia's lethal injection protocol. Plaintiffs argued that the testimony and documents were necessary to support their 42 U.S.C. § 1983 claims pending in the Southern District of Mississippi challenging the legality of Mississippi's lethal injection protocol. The GDC filed a motion to quash in the Northern District of Georgia, where compliance with the subpoena was required, arguing that disclosure of this information was barred by the Georgia Lethal Injection Secrecy Act.[1] Accepting the recommendation of a magistrate judge, the district court

---

[1] In pertinent part, the subpoena demands that the GDC produce documents concerning: (1) the GDC's attempt to secure or purchase pentobarbital for use in executions, (2) drug labels and package inserts for any drug purchased by the GDC for use in lethal injection executions, (3) the process by which the GDC decided to use a single lethal dose of barbiturate in its lethal injection protocol, including communications between any GDC officer and any other person or entity related to that process, (4) the GDC's use of compounded pentobarbital in executions, including communications between the GDC and any other person or entity (including pharmaceutical companies, pharmacies, and other corrections departments) related to the compounding of pentobarbital, (5) any GDC employee trainings on conducting lethal injections, including the names and qualifications of the person who taught at the training, and (6) communications

2

granted the motion to quash.  Plaintiffs appeal, arguing that the district court did not apply the correct standard of review to the magistrate judge's ruling, and that the motion to quash should have been denied on the merits.  After careful review, we affirm.

## PROCEDURAL BACKGROUND

This appeal is an offshoot of a § 1983 action filed by Plaintiffs in the Southern District of Mississippi.  Plaintiffs are Mississippi death row inmates who challenge the constitutionality of Mississippi's lethal injection protocol.  Mississippi's protocol recently was changed from a single injection procedure using only sodium pentothal or pentobarbital to a three-drug procedure that requires the serial injection of:  (1) either compounded pentobarbital or midazolam (a sedative/anesthetic), (2) vecuronium bromide (a paralytic), and (3) potassium chloride (which stops the heart).  According to Plaintiffs, there is a substantial risk that neither compounded pentobarbital nor midazolam—the first drug in the series—will sufficiently anesthetize the condemned inmate.  Consequently, Plaintiffs claim, an inmate who is injected with either drug could remain conscious

---

between the GDC and any other corrections department or attorney general's office related to the selection, purchase, or exchange of drugs for use in lethal injections.  Responding to any of these demands would require disclosure of the identity of people and entities that manufacture or supply drugs used in Georgia executions, and that otherwise participate in Georgia executions, in violation of the Lethal Injection Secrecy Act.

3

and fully sensate and thus experience suffocation when the second drug in the series—the paralytic vecuronium bromide, which renders the inmate unable to breathe—is administered.  Making matters worse, Plaintiffs contend, vecuronium bromide prevents all muscular movement and thus masks the pain that potassium chloride—the third and final drug in the series—is known to inflict in the absence of adequate anesthesia.  Plaintiffs also argue that the use of compounded pentobarbital—in and of itself—can be painful to the inmate because of the possibility that the pentobarbital will be made of counterfeit ingredients or that it will be contaminated during the compounding process.  Plaintiffs argue that Mississippi's three-drug lethal injection protocol thus creates an unacceptable risk of severe and unnecessary suffering, in violation of the Eighth Amendment.

To prevail on their Eighth Amendment claims, Plaintiffs must show that there is an alternative to Mississippi's three-drug protocol that is both "known and available" and that significantly reduces the risk of severe pain to the inmate.  *See Glossip v. Gross*, 135 S. Ct. 2726, 2738 (2015).  To meet that burden, Plaintiffs point to alternative lethal injection protocols used by other states, including Georgia.  The GDC has used a one-drug protocol that requires a single injection of compounded pentobarbital in its most recent executions.  Asserting that the single-injection pentobarbital protocol might, in theory, reduce the risk of pain to the

4

condemned inmate, Plaintiffs contend that it is a known and available alternative to Mississippi's three-drug protocol.

The Mississippi defendants[2] dispute Plaintiffs' claim that pentobarbital is available to them, asserting at various times in the underlying § 1983 action that they are unable to acquire pentobarbital, even in its compounded form. For example, in their answer to Plaintiffs' complaint, the Mississippi defendants denied that a single-drug procedure using pentobarbital was a feasible alternative to Mississippi's three-drug protocol. They subsequently filed a motion to dismiss Plaintiffs' § 1983 action under *Glossip*, citing the sworn testimony of Mississippi Department of Corrections officials stating that they had tried, but been unable to find a source of pentobarbital. In a hearing on the motion, the attorney for the Mississippi defendants emphasized that state corrections officials had not been able to obtain pentobarbital for use in executions despite a diligent search.

Plaintiffs acknowledge that pentobarbital has become difficult to acquire: a fact that is no surprise to them given that death penalty opponents have vigorously lobbied drug manufacturers to make this drug entirely unavailable for use in American executions. But Plaintiffs argue that it must be possible to obtain pentobarbital in some form because a few states, like Georgia, have found

---

[2] The Mississippi defendants include the Commissioner of the Mississippi Department of Corrections and various other state officials who are involved in implementing executions in Mississippi and who have been named in Plaintiffs' § 1983 complaint.

compounding pharmacies that agree to provide pentobarbital on condition of strict anonymity. Accordingly, trying to unmask the GDC's source for this drug, Plaintiffs served the GDC with the non-party subpoena that is at issue in this appeal. The subpoena directs the GDC to appear at a Rule 30(b)(6) deposition and to produce documents concerning the feasibility of a one-drug lethal injection protocol using pentobarbital, including specific details about the GDC's source and manner of acquiring pentobarbital.

The GDC filed a motion to quash the subpoena in the Northern District of Georgia, arguing that the information sought in the subpoena was irrelevant to the claims asserted in the underlying § 1983 litigation, that it was protected from disclosure by Georgia's Lethal Injection Secrecy Act and other privileges, and that disclosure would impose an undue burden on the State. The motion was referred to a magistrate judge, who granted the motion to quash. In his written order on the motion, the magistrate judge relied heavily on the Lethal Injection Secrecy Act, which precludes the disclosure of the "identifying information" of any person or entity that participates in a Georgia execution or that supplies the drugs used by the State in executions. *See* O.C.G.A. § 42-5-36(d).

Plaintiffs filed objections to the magistrate judge's ruling, arguing that the information sought by the subpoena was not privileged. After reviewing those objections, the district court accepted and adopted the magistrate judge's decision

6

to quash the subpoena.  First, the district court determined that the "clearly erroneous" or "contrary to law" standard applied to its review of the magistrate judge's ruling because the motion to quash was a non-dispositive pretrial matter. The district court then concluded that the magistrate judge's ruling was neither clearly erroneous nor contrary to law.

Plaintiffs appeal, arguing that (1) the district court applied the wrong standard of review to the magistrate judge's ruling and (2) the motion to quash should have been denied on the merits.

## STANDARD OF REVIEW

We review a trial court's ruling on a motion to quash a subpoena "only for an abuse of discretion."  *In re Hubbard*, 803 F.3d 1298, 1307 (11th Cir. 2015) (citing *Ariel v. Jones*, 693 F.2d 1058, 1060 (11th Cir. 1982)).  Thus, we will leave the district court's ruling on the motion "undisturbed" unless the district court has "made a clear error of judgment, or has applied the wrong legal standard." *Ameritas Variable Life Ins. Co. v. Roach*, 411 F.3d 1328, 1330 (11th Cir. 2005); *see also SunAmerica Corp. v. Sun Life Assurance Co. of Canada*, 77 F.3d 1325, 1333 (11th Cir. 1996) (noting that an abuse of discretion occurs when the district court makes "a clear error of judgment" or applies "an incorrect legal standard" (internal quotation marks omitted)).

7

## DISCUSSION

### I.    The District Court Applied The Correct Standard Of Review To The Magistrate Judge's Ruling On The Motion To Quash

As noted above, the district court reviewed the magistrate judge's ruling on the motion to quash under the clearly erroneous or contrary-to-law standard. According to Plaintiffs, the district court should have reviewed the magistrate judge's ruling de novo, and its failure to do so requires reversal under the Federal Magistrate's Act, 28 U.S.C. § 636, and Rule 72 of the Federal Rules of Civil Procedure.

The standard of review the district court was required to apply depends on whether we characterize the GDC's motion to quash as a dispositive or a non-dispositive matter.  *See* 28 U.S.C. § 636(b)(1).  Pursuant to the Federal Magistrate's Act, a district court reviews a magistrate judge's ruling on non-dispositive matters under the clearly-erroneous or contrary-to-law standard.  *Id.* § 636(b)(1)(A); *see also* Fed. R. Civ. P. 72(a) ("When a pretrial matter not dispositive of a party's claim or defense is referred to a magistrate judge to hear and decide . . . [t]he district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law.").  But if the matter is dispositive, the district court must review any objected-to portion of the magistrate judge's ruling de novo.  28 U.S.C. § 636(b)(1).

8

The Federal Magistrate's Act lists several examples of motions that qualify as dispositive matters, including motions for injunctive relief, for judgment on the pleadings, for summary judgment, to dismiss or quash an indictment, to suppress evidence in a criminal case, to dismiss or permit maintenance of a class action, to dismiss for failure to state a claim, and to involuntarily dismiss an action. *Id.* § 636(b)(1)(A).  Unsurprisingly, a routine pretrial discovery motion, such as the motion to quash at issue in this case, is not included in this list of dispositive motions.  *See In re Comm'r's Subpoenas*, 325 F.3d 1287, 1292 n.2 (11th Cir. 2003) ("The district court correctly observed that the standard of review by which it reconsidered the magistrate judge's [order quashing subpoenas] is 'clearly erroneous or contrary to law.'" (citing 28 U.S.C. § 636(b)(1)(A))), *overruled on other grounds by Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004); *Maynard v. Bd. of Regents of the Div. of Univ. of the Fla. Dep't of Ed.*, 342 F.3d 1281, 1286 (11th Cir. 2003) (characterizing a magistrate judge's discovery rulings as non-dispositive orders and holding that the plaintiff's failure to object to the rulings in the district court waived his right to appeal them).

Indeed, Plaintiffs do not dispute that had the GDC's motion to quash been filed in the Southern District of Mississippi, where the underlying § 1983 action is pending, the motion would be considered non-dispositive and a magistrate judge's ruling on it would be reviewed under the clearly-erroneous or contrary-to-law

9

standard.  Yet, Plaintiffs argue that the magistrate judge's ruling on the motion to quash filed in this case should be considered dispositive—and thus reviewed under the de novo standard—because it resolves and finally disposes of the litigation between Plaintiffs and the GDC that is pending in the Northern District of Georgia.

This argument is unpersuasive.  The GDC's motion to quash required separate litigation between Plaintiffs and the GDC in the Northern District of Georgia only because the place for compliance with the subpoena—and thus the proper venue for filing a motion to quash—happened to be in the Northern District of Georgia, not in Mississippi.  *See* Fed. R. Civ. P. 45(c), (d)(3).  And the magistrate judge's ruling on the motion resulted in a final disposition of the issues raised in the motion, permitting Plaintiffs to appeal the ruling to this Court.  *See Ariel*, 693 F.2d at 1059 (noting that a litigant would have "no other means of effectively obtaining review" of such a ruling if it were not considered final for purposes of appeal).  But that does not somehow transform into a dispositive ruling a routine pretrial discovery motion that is ancillary to the underlying § 1983 litigation pending in the Southern District of Mississippi.

In short, we find no reason to treat the magistrate judge's ruling on the GDC's motion to quash any differently than we would treat a similar pretrial discovery motion had it been filed in the district where the underlying § 1983 action is pending:  the Southern District of Mississippi.  As such, we conclude that

the district court correctly applied the clearly-erroneous or contrary-to-law standard of review to the magistrate judge's ruling on the motion to quash.

## II.    The District Court Did Not Abuse Its Discretion By Affirming The Magistrate Judge's Ruling To Grant The GDC's Motion To Quash

Having concluded that the district court applied the correct standard of review, the only question for this Court is whether the district court otherwise abused its discretion—by either relying on an error of law or committing a clear error of judgment—when it affirmed the magistrate judge's ruling and granted the GDC's motion to quash. *See Ameritas Variable Life Ins.*, 411 F.3d at 1330. In essence, Plaintiffs argue on appeal that the quashing of their subpoena amounts to the improper creation of a new federal evidentiary privilege.[3] We disagree with Plaintiffs' characterization, conclude that the district court did not abuse its

---

[3] Plaintiffs also argue that the district court should have required the GDC to submit a privilege log before granting the motion to quash. *See* Fed. R. Civ. P. 45(e)(2)(A)(ii) (requiring a person withholding subpoenaed information under a claim of privilege to "describe the nature of the withheld documents [or] communications"). Given the primary focus of the GDC subpoena, we are unpersuaded by Plaintiffs' argument. The purpose of requiring a privilege log is to "enable the parties to assess [a] claim" of privilege. *Id.* Here, it is apparent from the face of the subpoena that the information sought therein falls within the plain language of the Lethal Injection Secrecy Act. More importantly, the only information with even arguable relevance to Plaintiffs' § 1983 claims—that is, information identifying Georgia's source of compounded pentobarbital, which Plaintiffs argue is necessary to show that pentobarbital is a known and available alternative to Mississippi's three-drug protocol, as required for Plaintiffs to prevail under *Glossip*—is directly barred from disclosure by the Act. The remainder of the information sought is either readily available to the public (for example, Georgia's lethal injection protocols from 2010 to the present) or of limited relevance to Plaintiffs' burden under *Glossip* to point to a known and available alternative to Mississippi's three-drug protocol (for example, documents related to the process by which Georgia determined that it would or would not use midazolam in its executions). Thus, the district court did not abuse its discretion by quashing the subpoena in its entirety, and without first requiring the GDC to submit a privilege log.

11

discretion in granting the motion to quash, and, accordingly, we affirm the district

court's order.

### A. The Relevance of the Information Sought in the GDC Subpoena to the Pending § 1983 Mississippi Litigation Is Highly Questionable

For purposes of discovery, a party may subpoena information from a non-

party to litigation, but Federal Rule of Civil Procedure 45 protects the subpoena

recipient by requiring the issuer to "take reasonable steps to avoid imposing undue

burden or expense on a person subject to the subpoena" and by setting out several

mandatory and discretionary grounds for quashing a subpoena. *See* Fed. R. Civ. P.

45(d)(1), (3). While Rule 45 does not specifically identify irrelevance as a reason

to quash a subpoena, it is generally accepted that the scope of discovery allowed

under Rule 45 is limited by the relevancy requirement of the federal discovery

rules.[4] *See* Fed. R. Civ. P. 26(b)(1) (stating that discovery is allowed to the extent

it is "relevant to [a] party's claim or defense"); Advisory Committee Note to the

1970 Amendments to Rule 45 (noting that the 1970 amendments "make it clear

that the scope of discovery through a subpoena is the same as that applicable to

---

[4] Federal courts in this circuit have uniformly applied this principle. *See Am. Fed. of State, County and Mun. Employees (AFSCME) Council 79 v. Scott*, 277 F.R.D. 474, 476 (S.D. Fla. 2011) ("Federal courts . . . have treated the scope of discovery under a subpoena [a]s the same as the scope of discovery under Rule 26."); *Williams v. City of Birmingham*, 323 F. Supp. 3d 1324, 1329 (N.D. Ala. 2018) ("The scope of permissible discovery with respect to a Rule 45 subpoena is that which is set forth in [Federal Rule of Civil Procedure] 26(b)(1)[.]").

Rule 34 and the other discovery rules"). Thus, a subpoena issued under Rule 45 should be quashed to the extent it seeks irrelevant information.

As indicated by the language of Rule 26, the relevance of information sought in discovery depends on the claims asserted in the underlying action and the legal standards that govern those claims. *See* Fed. R. Civ. P. 26(b)(1) (permitting discovery of nonprivileged matter that is "relevant to any party's claim or defense"); *see also* Fed. R. Evid. 401 (stating that information is relevant if it has a "tendency to make a fact more or less probable" and "the fact is of consequence in determining the action"). To determine the relevance of information sought by Plaintiffs in the GDC subpoena, one must examine the showing that Plaintiffs must make in order to prove the Eighth Amendment claims they assert in the underlying Mississippi litigation: (1) that Mississippi's method of execution presents a "substantial risk of serious harm" because it is likely to cause "serious illness and needless suffering" and (2) that there is "an alternative" to the challenged method of execution that is "feasible, readily implemented, and in fact significantly reduces a substantial risk of severe pain." *Glossip*, 135 S. Ct. at 2737 (quoting *Baze v. Rees*, 553 U.S. 35, 50–52 (2008) (alteration adopted) (internal quotation marks omitted).

The GDC subpoena seeks information concerning Georgia's supply and use of pentobarbital in a single-drug lethal execution protocol. Such information

13

obviously has no relevance to the first prong of the Eighth Amendment analysis—the risk of harm presented by Mississippi's method of execution. But although he ultimately decided that the subpoena should be quashed, the magistrate judge concluded that information concerning Georgia's supply and use of pentobarbital in a single-drug protocol is relevant to the second prong of the Eighth Amendment analysis because it could prove "the existence of a feasible alternative" to Mississippi's lethal injection protocol.

As explained at greater length below, we find it very questionable that the information sought by Plaintiffs is relevant to even the second prong of Plaintiffs' Eighth Amendment claim in the underlying Mississippi action. First, that Georgia has found a supplier who, under a statutory assurance of absolute confidentiality, provides pentobarbital to Georgia officials for their use in executions has very little bearing on whether pentobarbital is a feasible alternative to Mississippi's challenged lethal injection protocol, absent some reason to believe that Georgia's anonymous pentobarbital supplier would supply the drug to Mississippi if its identity is unmasked in this litigation. And, as the actions of lethal injection drug suppliers around the nation clearly indicate, it is highly unlikely that Georgia's pentobarbital supplier will provide the drug to Mississippi if its identity is disclosed pursuant to the GDC subpoena. After all, if this anonymous supplier wanted to market the drug to Mississippi, nothing is stopping it from doing so.

14

Moreover, it is quite predictable that the supplier will stop providing the drug to Georgia once its identity is disclosed.

Second, to prevail on their Eighth Amendment claims, Plaintiffs must show not only the existence of a feasible alternative but also that this feasible alternative "in fact significantly reduces a substantial risk of severe pain." *Glossip*, 135 S. Ct. at 2737 (internal quotation marks omitted). Yet, Plaintiffs' own allegations in the Mississippi complaint reveal their additional contention that use of compounded pentobarbital in an execution would itself create a risk of severe pain, meaning that they also challenge the constitutionality of the use of this substance.

    1.    <u>Information concerning Georgia's supply and use of pentobarbital in executions cannot help Plaintiffs prove a feasible alternative to Mississippi's lethal injection protocol.</u>

That a drug supplier under statutory assurances of absolute confidentiality has agreed to provide Georgia with pentobarbital for use in executions says nothing about the willingness of that supplier to provide Mississippi with the drug should the supplier's identity be revealed in this litigation. Indeed, we have so held in the past when a capital litigant before our court argued the existence of a feasible alternative to the drug protocol used by his state based on the fact that other states use the particular alternative in question. *See Arthur v. Comm'r, Ala. Dep't of Corr.*, 840 F.3d 1268, 1302 (11th Cir. 2016) ("We expressly hold that the fact that other states in the past have procured a compounded drug and pharmacies

15

in Alabama have the skills to compound the drug does not make it available to [Alabama] for use in lethal injections in executions."), *abrogated on other grounds by Bucklew v. Precythe*, 139 S. Ct. 1112, 1127–29 (2019).  Another court in similar litigation has likewise recognized that a drug supplier operating under a promise of confidentiality is unlikely to provide another state with lethal injection drugs, and probably will stop providing the drugs altogether, once its identity is disclosed in litigation.  *See McGehee v. Texas Dep't of Criminal Justice*, No. H-18-1546, 2018 WL 3996956, at *9 (S.D. Tex. Aug. 21, 2018).  Indeed, Plaintiffs are well aware that, in their own case, Mississippi's present lethal injection drug supplier will refuse to provide Mississippi with drugs for use in executions should its identity be revealed.  *See Jordan v. Hall*, No. 3:15CV295HTW-LRA, 2018 WL 1546632, at *8 (S.D. Miss. Mar. 29, 2018).

To understand why lethal injection drug suppliers are so resistant to disclosure of their identities, one must be aware of the history underlying the practice of lethal injection in this country, which the Supreme Court helpfully summarized in *Glossip*.  *See Glossip*, 135 S. Ct. at 2731–34.  As the *Glossip* Court explained, the death penalty has been an accepted form of punishment since the founding of this country, but our views of how it should be implemented have changed over time, and we have settled on lethal injection as the most humane means of carrying out a death sentence.  *See id.* at 2731–32 (noting that lethal

16

injection "today is by far the most prevalent method of execution in the United States" (internal quotation marks omitted)); *see also Ledford v. Comm'r, Ga. Dep't of Corr.*, 856 F.3d 1312, 1318 (11th Cir. 2017) ("[T]he firing squad, hanging, the electric chair, and the gas chamber have each in turn given way to more humane methods [of execution], culminating in today's consensus on lethal injection." (second alteration in original) (internal quotation marks omitted)).  Having settled on lethal injection as the preferred method of execution, states also eventually settled on a preferred means of implementing an execution by lethal injection:  a three-drug protocol involving (1) an initial injection of sodium thiopental, a fast-acting barbiturate sedative that induces a deep, comalike unconsciousness, (2) a second injection of a paralytic agent that inhibits all muscular-skeletal movements and thus stops respiration, and (3) a third injection of potassium chloride, which induces cardiac arrest.  *See Glossip*, 135 S. Ct. at 2732.  This protocol, which the Supreme Court held constitutional in *Baze*, for many years "enabled [s]tates to carry out the death penalty in a quick and painless fashion."  *Id.* at 2733.

Although *Baze* "cleared any legal obstacle" to the three-drug protocol described above, the *Glossip* Court explained, "a practical obstacle soon emerged, as anti-death-penalty advocates pressured pharmaceutical companies to refuse to supply the drugs used to carry out death sentences."  *Id.*  Their advocacy had its intended effect:  the only American manufacturer of sodium thiopental "was

17

persuaded to cease production of the drug." *Id.* Then when the manufacturer announced plans to resume production of the drug in Italy, activists kept the pressure on and their vigorous advocacy prompted both the manufacturer and the Italian government to disallow the sale of sodium thiopental for use in American executions. *See id.* Ultimately, rather than face the uproar created by death penalty opponents, the company entirely withdrew sodium thiopental from the market. *See Glossip*, 135 S. Ct. at 2733.

Having lost access to sodium thiopental as a result of the vociferous pressure brought to bear by death-penalty opponents, states were forced to try to find a different first drug for use in the three-drug lethal injection protocol. They found such a drug—pentobarbital—which, like sodium thiopental, is a barbiturate that can reliably induce a coma-like and pain-free state. *See id.* But anti-death-penalty advocates once again quickly intervened to pressure the pentobarbital manufacturer into refusing to provide the drug to states for use in executions. They succeeded. *See id.* After being heavily lobbied by death penalty opponents, the Danish manufacturer of pentobarbital took steps to block the use of the drug in American executions. *See id.* As described by the *Glossip* Court, the ultimate outcome of this very effective advocacy by death penalty opponents has been to make it difficult—if not impossible—for states to acquire sodium thiopental and pentobarbital for use in executions, even though it is generally acknowledged that

the use of either of these drugs renders an execution by lethal injection as humane as it can possibly be. *See id.* at 2733–34.

In the wake of these continuing set-backs, some states have managed to find a compounding pharmacy that is willing to supply pentobarbital for the state to use in lethal injections. Yet, understandably, given the vehement objection visited on lethal injection drug manufacturers, these compounding pharmacies have agreed to supply the compounded pentobarbital only when confidentiality is guaranteed either by contract or statute. *See In re Missouri Dep't of Corr.*, 839 F.3d at 734–35 (citing testimony indicating that Missouri's pentobarbital supplier had advised a state corrections department official that the supplier would no longer provide the drug to Missouri if its identity was disclosed); *McGehee*, 2018 WL 3996956, at *9 (noting that Texas's pentobarbital supplier had "based its decision to supply [Texas] with drugs on its identity remaining secret" (internal quotation marks omitted)); *Arthur*, 840 F.3d at 1302 ("[W]hile four states ha[ve] recently used compounded pentobarbital in their own execution procedures . . . none were willing to give the drug to [Alabama] or name their source.").

And a growing number of states, including Georgia, have passed laws that are designed to protect the confidentiality of such pharmacies, as well as the other people and entities who participate in executions. *See* O.C.G.A. § 42-5-36(d)(2) (barring disclosure of lethal injection drug supplier information and classifying

19

such information as a "confidential state secret"); Va. Code § 53.1-234 (stating that the identity of Virginia's lethal injection drug suppliers "shall be confidential . . . and shall not be subject to discovery or introduction as evidence in any civil proceeding unless good cause is shown"); Ohio Revised Code § 2949.221 (providing that information identifying Ohio's lethal injection drug suppliers "shall be classified as confidential" and is not subject to "discovery, subpoena, or any other means of legal compulsion for disclosure"); Tex. Gov't Code Ann. § 552.1081 (exempting lethal injection drug supplier information from the disclosure requirements of the Texas Public Information Act); Miss. Code Ann. § 99-19-51(6)(c) (stating that the identity of lethal injection drug suppliers "shall at all times remain confidential").

As explained in the *McGehee* action in Texas, pharmacies view the confidentiality provided by these state statutes as a necessary shield against the "threats, harassment, and boycotts to which other suppliers of lethal injection drugs have been subjected as a result of their lawful decision to supply state correctional departments with drugs needed to carry out executions." *McGehee*, 2018 WL 3996956, at *9 (internal quotation marks omitted). *See also In re Virginia Dep't of Corr. v. Jordan*, No. 3:17MC02, 2017 WL 5075252, at *19 (E.D. Va. Nov. 30, 2017) (citing an intimidating email sent to Missouri's lethal injection drug supplier threatening that "it only takes one fanatic with a truckload of fertilizer to make a

real dent in business as usual"), *aff'd*, *Virginia Dep't of Corr. v. Jordan*, 921 F.3d 180 (4th Cir. 2019) ; *Arthur*, 840 F.3d at 1305 ("Given the controversial nature of the death penalty, it is not surprising that parties who might supply these drugs are reluctant to have their names disclosed.").

Georgia's secrecy statute, which was enacted in 2013, states that the identity of any person or entity who participates in a lethal injection is "a confidential state secret" that is not "subject to disclosure . . . under judicial process." *See* O.C.G.A. § 42-5-36(d). Thus, the pharmacy that supplied the GDC with the pentobarbital used in Georgia's most recent executions did so under the assurance of absolute confidentiality provided by this Georgia statute. As *Glossip* has made clear, should the pharmacy's identity be revealed as a result of the enforcement of the present subpoena, there can be no suspense as to what will happen next. Anti-death penalty advocates will pressure this compounding pharmacy to cease supplying pentobarbital to any prison system. And if history is a teacher—and it surely is on this matter—the pharmacy will be forced to knuckle under to this pressure. Meaning that not only will Georgia no longer have a supplier for the first drug in its three-drug protocol, but Mississippi will be no closer to finding a willing supplier of pentobarbital, which is ostensibly the purpose behind Plaintiffs' subpoena. Thus, as it is quite likely that, once its identity is revealed, the pharmacy will simply cease to supply the drug to any state, including Georgia,

21

there is very little likelihood that the drug-supplier information requested in the GDC subpoena will help Plaintiffs in their effort to show a feasible alternative to Mississippi's lethal injection protocol.  *See In re Missouri Dep't of Corr.*, 839 F.3d at 736 ("[B]ecause [the supplier] would not supply pentobarbital to Mississippi once its identity is disclosed, we conclude that [the supplier's] identity has no relevance to the inmates' Eighth Amendment claim."); *Bucklew*, 139 S. Ct. at 1129 ("[A]n inmate must show that his proposed alternative method is not just theoretically feasible but also readily implemented" (internal quotation marks omitted)).

2.    Given Plaintiffs' own challenge to the safety of compounded pentobarbital as a lethal injection drug, information providing a source for that drug would not help Plaintiffs show an alternative method of execution that significantly reduces the risk of pain involved in a Mississippi execution.

There is a second reason why the information requested by Plaintiffs bears only marginal relevance to Plaintiffs' underlying claims in the Mississippi action. It is undisputed that the only form of pentobarbital the GDC has been able to acquire in recent years is compounded pentobarbital, and that Georgia has in fact used compounded pentobarbital in its most recent executions.  *See Ledford*, 856 F.3d at 1315 (noting that in March 2013 Georgia began conducting lethal injections with a single dose of compounded pentobarbital, rather than the single dose of FDA-approved pentobarbital it formerly used.).  Plaintiffs' subpoena seeks

22

from the GDC information concerning its source of compounded pentobarbital ostensibly because this information might enable Mississippi to likewise use this same source to obtain compounded pentobarbital and thereby to utilize a drug that would be constitutionally acceptable.

Yet, at the same time Plaintiffs offer this rationale to support their claim that the information is relevant, Plaintiffs' complaint nonetheless questions the safety of compounded pentobarbital. Indeed, the Mississippi complaint contains more than twenty allegations describing the "substantial risk of serious harm and severe pain" to an inmate who is subjected to a lethal injection using compounded pentobarbital. Plaintiffs might well respond that the Mississippi complaint specifically challenges the use of compounded pentobarbital as the first drug in Mississippi's three-drug lethal injection protocol, not as the sole drug to implement the execution. Certainly, some allegations can be so interpreted.

However, in other allegations in the Mississippi complaint, Plaintiffs clearly question the safety of compounded pentobarbital, no matter what protocol is used. For example, Plaintiffs allege that compounded drugs are not FDA-approved, are not subject to regulations that ensure their strength and quality, and have not been evaluated for effectiveness and safety. Further noting the experimental nature of compounded pentobarbital, Plaintiffs allege that they will be among the first prisoners in Mississippi to be executed with compounded pentobarbital. Given the

23

uncertainty of the compounding process, Plaintiffs allege that "a substantial risk of serious harm to Plaintiffs" will result from the use of compounded pentobarbital.

Indeed, Plaintiffs allege that compounded pentobarbital "poses a substantial risk of serious harm" to the prisoner "by inflicting pain and suffering itself." Plaintiffs point to the Oklahoma execution of Michael Lee Wilson, who, after being injected with compounded pentobarbital, stated:  "I feel my whole body burning."  Wilson's experience, which the complaint alleges to have been "an excruciatingly painful reaction" prompted by the injection of compounded pentobarbital, reveals that "Defendants' untried and untested drugs create a substantial risk that Plaintiffs will suffer unnecessary and excruciating pain either by the injection of the compounded pentobarbital causing a painful reaction itself, or by the compounded pentobarbital failing to work, resulting in a torturous death by life suffocation and cardiac arrest." (emphasis added).  In short, Plaintiffs allege that compounded pentobarbital "made with unknown and potentially contaminated or counterfeit ingredients is nothing short of human experimentation and presents an unacceptable risk that Plaintiffs will experience unnecessary pain and suffering if and when they are executed."

That's not all.  Plaintiffs actually seek an injunction prohibiting the use of any compounded drug, and particularly compounded pentobarbital, in any execution.  All of which makes one wonder what the point is of outing a supplier

24

of a substance, use of which substance Plaintiffs will immediately attack even should a willing public supplier ever again be located.

Obviously, Plaintiffs' allegations challenging the safety of compounded pentobarbital greatly undermine their argument that the identity of Georgia's supplier of this substance is relevant to their Eighth Amendment claims. Pursuant to *Baze* and *Glossip*, Plaintiffs cannot prevail on these claims merely by proving that there is a feasible alternative to Mississippi's lethal injection protocol. Rather, they must also prove the existence of a feasible alternative that "would entail a significantly less severe risk" of pain. *See Glossip*, 135 S. Ct. at 2737. *See also Bucklew*, 139 S. Ct. at 1130 ("A minor reduction in risk is insufficient; the difference must be clear and considerable."). Thus, even assuming the information sought in the GDC subpoena would help Plaintiffs prove that there is some alternative to Mississippi's three-drug protocol, that information will not advance their Eighth Amendment claims unless the proposed alternative substantially reduces the risk of severe pain to the condemned inmate. *See Bucklew*, 139 S. Ct. at 1130.

Plaintiffs fail this test. They appear to have little to nothing to gain by obtaining information from the GDC about its use of compounded pentobarbital in executions. At best, enforcement of the GDC subpoena can only provide Plaintiffs with an alternative method of execution that—besides not being feasible because

25

disclosure of the supplier will likely result in its refusal to supply in the future—

Plaintiffs contend to be unconstitutional. *See Glossip*, 135 S. Ct. at 2737

("[P]risoners cannot successfully challenge a [s]tate's method of execution merely

by showing a slightly or marginally safer alternative. Instead, prisoners must

identify an alternative that is feasible, readily implemented, and in fact

significantly reduces a substantial risk of severe pain." (internal quotation marks

and citation omitted)).

This conclusion renders problematic Plaintiffs' argument that the

information requested is relevant. Nonetheless, as explained below, even if the

information sought in the GDC subpoena is relevant to the claims asserted in the

underlying Mississippi litigation, the subpoena must still be quashed under the

provision of Federal Rule of Civil Procedure 45(d)(3)(A) requiring that result when

a subpoena "subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iv).

## B.    Potential Pertinent Grounds for Quashing the Present Subpoena

Georgia's Lethal Injection Secrecy Act states that:

> The identifying information of any person or entity who participates in or administers the execution of a death sentence and the identifying information of any person or entity that manufactures, supplies, compounds, or prescribes the drugs, medical supplies, or medical equipment utilized in the execution of a death sentence shall be confidential and shall not be subject to disclosure . . . under judicial process.

26

O.C.G.A. § 42-5-36(d)(2).  The Act defines "identifying information" to include "any records or information that reveals a name, residential or business address, residential or business telephone number, day and month of birth, social security number, or professional qualifications" of a person or entity that "manufactures, supplies, [or] compounds" lethal injection drugs.  *Id.* § 42-5-36(d)(1), (2).  It classifies such information as "a confidential state secret."  *Id.* § 42-5-36(d)(2).

Rule 45(d)(3) provides several potential grounds for quashing the GDC subpoena:  some of them mandatory and some discretionary.  Among the mandatory grounds, a subpoena must be quashed if it requires disclosure of "privileged or other protected matter" (Rule 45(d)(3)(A)(iii)) or if the subpoena "subjects a person to undue burden" (Rule 45(d)(3)(A)(iv)).  Among the discretionary grounds, Rule 45(d)(3)(B)(i) gives the district court the authority to quash a subpoena that would require the disclosure of trade secrets and other confidential information.  In relevant part, the discretionary rule states that a district court may quash a subpoena that requires "disclosing a trade secret or other confidential research, development, or commercial information."  Fed. R. Civ. P. 45(d)(3)(B)(i).

The magistrate judge's explanation of his reasoning in quashing the subpoena was admittedly quite spare.  Indeed, he did not cite Rule 45 at all in his written order.  Yet, both his comments at the hearing and his written order indicate

that he considered the interests underlying all three provisions to be apt in determining whether the motion to quash was meritorious.[5]

As to the provision of Rule 45 permitting the quashing of a subpoena that seeks to disclose trade secrets and other confidential information—Rule 45(d)(3)(B)(i)—"courts weigh the claim to privacy against the need for disclosure." *See Festus & Helen Stacy Found., Inc. v. Merrill Lynch, Pierce Fenner & Smith Inc.*, 432 F. Supp. 2d 1375, 1380 (N.D. Ga. 2006); *see also United States ex rel. Willis v. SouthernCare, Inc.*, No. CV410-124, 2015 WL 5604367, at *5 (S.D. Ga. Sept. 23, 2015) (applying a balancing test to the Rule 45(d)(3)(B)(i) analysis to determine "whether the need for disclosure outweighs [the] claim to privacy"). Certainly, the interests sought to be protected by the trade-secret provision in Rule 45 are analogous to those the State seeks to protect by preventing any disclosure of information revealing the identity of persons connected with the supplying of compounded pentobarbital. That Georgia has deemed the source of the drug to be a "confidential state secret," O.C.G.A. § 42-5-36(d)(2), and has

---

[5] His statements during the hearing on the motion to quash indicated the need to factor into his analysis the heavy burden that compliance with the GDC subpoena would impose on the state. For example, the magistrate judge noted the need to balance Plaintiffs' need for the information requested in the subpoena in the underlying Mississippi litigation with the "need[] to keep the information quiet." In his written order, he alluded to the need to decide whether the information sought in the GDC subpoena was "privileged or otherwise protected." Finally, it is apparent that the magistrate judge viewed the information sought in the subpoena as protected from disclosure due to its highly confidential nature.

28

formalized that characterization via a statute forbidding disclosure demonstrates the importance the State places on maintaining the confidentiality of this information.  Indeed, this Court has acknowledged that disclosure of the information would threaten the State's ability to fully enforce its criminal sentencing laws.  *Gissendaner v. Comm'r*, *Ga. Dep't of Corr.*, 803 F.3d 565, 569 (11th Cir. 2015) ("*Gissendaner II*").  Yet, we are aware of no authority that has expanded the trade-secret provision, which is typically applied in commercial contexts, to a scenario such as this.  Thus, we do not base our affirmance on this ground.

As to the provision of Rule 45 that mandates the quashing of a subpoena that would require the disclosure of "privileged or other protected matter" (Rule 45(d)(3)(A)(iii)), the existence of a Georgia statute prohibiting disclosure does not, by itself, give rise to a federal privilege.  Federal evidentiary privileges in federal question litigation arising in federal court are governed by federal law, and a state evidentiary privilege does not automatically give rise to a federal evidentiary privilege.  *See Hancock v. Hobbs*, 967 F.2d 462, 466 (11th Cir. 1992) ("A claim of privilege in federal court is resolved by federal common law, unless the action is a civil proceeding and the privilege is invoked with respect to an element of a claim or defense as to which State law supplies the rule of decision." (internal quotation marks omitted)).  And while federal courts are empowered by Federal Rule of

29

Evidence 501 to recognize new federal privileges arising from state law, they generally are hesitant to do so. *See Doe No. 1 v. United States*, 749 F.3d 999, 1009 (11th Cir. 2014) (observing that Congress has empowered the federal courts through Rule 501 to recognize new privileges, but that there is a presumption against doing so).

But the text of Rule 45(d)(3)(A)(iii) indicates that the protection of that specific provision extends beyond the strict bounds of "privileged" information to encompass "other protected matter." Fed. R. Civ. P. 45(d)(3)(A)(iii). While caselaw has not fleshed out the definition of the term "other protected matter," there are certainly sound arguments here sufficient to prompt consideration whether the confidentiality agreement between the State of Georgia and the undisclosed pentobarbital supplier, safeguarded by a state statute forbidding disclosure of that supplier's identity, constitutes "other protected matter."

Indeed, federal courts have recognized that privacy interests and confidentiality concerns can factor into a decision whether to quash a subpoena under Rule 45, even though the information requested by the subpoena is not subject to a federal evidentiary privilege. *See Alig-Mielcarek v. Jackson*, 286 F.R.D. 521, 526–27 (N.D. Ga. 2012) (quashing a plaintiff's request for nonparty educational records based in part on the privacy rights protected by the Family Educational Rights and Privacy Act of 1974 ("FERPA"), which "does not provide

30

a privilege preventing disclosure of student records, [but nevertheless] seeks to protect the confidentiality of educational records"); *McGehee*, 2018 WL 3996956, at \*11 (noting that the Texas statute exempting lethal injection drug supplier information from the requirements of a state Public Information Act "exhibits a democratically manifested intent not to disclose the source of Texas' lethal injection drugs" which, though it does not give rise to a federal evidentiary privilege, should not be ignored). *See also Porter v. Ray*, 461 F.3d 1315, 1324 (11th Cir. 2006) (affirming refusal to allow discovery of state parole records, which are not subject to a federal evidentiary privilege, based in part on confidentiality considerations); *McGoy v. Ray*, 164 F. App'x 876, 878 (11th Cir. 2006) (holding that the district court did not abuse its discretion when it found that the facts asserted by the plaintiff were insufficient to compel discovery of confidential parole records, which were designated a confidential state secret by state statute).

Moreover, when focusing on the need for protection, it is not just protection for the State and its interests that are at issue here. When a citizen is assured via a state statute that his identity will be protected if, at some great physical and economic risk to himself, he provides a service to the state, that promise should not be lightly discarded.

31

Nevertheless, we do not base our decision to affirm the district court's quashing of Plaintiff's third-party subpoena on the trade-secret provision or the "other protected matter" provision set out in Rule 45(d)(3)(B)(i) and 45(d)(3)(A)(iii), respectively. Although the interests underlying those provisions inform our ultimate analysis, we conclude that Plaintiffs' subpoena was required to be quashed because it subjected the GDC to an "undue burden," which, pursuant to Rule 45(d)(3)(A)(iv), mandates the quashing of the subpoena.

### C. Compliance with Plaintiffs' Subpoena Would Impose an Undue Burden on the State of Georgia

Even if Rule 45(d)(3)'s protection of a "trade secret," of "confidential information," and of "other protected matter" is inapt here for purposes of quashing the GDC subpoena, it is clear that compliance with this subpoena would impose an "undue burden" on the State of Georgia. It therefore must be quashed pursuant to Rule 45(d)(3)(A)(iv), which makes mandatory the quashing of any subpoena that would impose such a burden on the target of the subpoena.

The undue burden analysis requires the court to "balance the interests served by demanding compliance with the subpoena against the interests furthered by quashing it." 9A Wright & Miller, Federal Practice and Procedure § 2463.1 (3d ed. 2019). *See also Virginia Dep't of Corr.*, 2017 WL 5075252, at *5, *10 (applying the undue burden analysis). Several factors have been identified as pertinent to the analysis, including the "relevance of the information requested" to

32

the underlying litigation and the "burden [that would be] imposed" by producing it. *Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 818 (5th Cir. 2004).  The status of the subpoena recipient as a non-party is also a factor that can weigh against disclosure in the undue burden inquiry.  *See id.* ("[I]f the person to whom the document request is made is a non-party, the court may also consider the expense and inconvenience to the non-party.").

1.    Prior Litigation Concerning the Lethal Injection Secrecy Act

As discussed above, Georgia passed the Lethal Injection Secrecy Act in response to the concerted effort by death penalty opponents to make lethal injection drugs unavailable for use in American executions.  *See Owens v. Hill*, 295 Ga. 302, 317 (2014) (describing the rationale underlying the passage of Georgia's Lethal Injection Secrecy Act).  One can reasonably infer that it is only because of this statute that Georgia has been able to secure a source of pentobarbital for use in executions despite its relative scarcity.  And Georgia's ability to obtain compounded pentobarbital would be jeopardized were it not for the confidentiality provided by the Lethal Injection Secrecy Act.  *See id.* ("[W]ithout the confidentiality offered to execution participants by the statute, as the record and our case law show, there is a significant risk that persons and entities necessary to the execution would become unwilling to participate."); *see also Gissendaner II*, 803 F.3d at 569 ("To require . . . that Georgia open up about

33

its source of pentobarbital would result in the drug becoming completely unavailable for use in executions, even though its use does not violate the Eighth Amendment."), *cert. denied sub nom.*, *Gissendaner v. Bryson*, 136 S. Ct. 26 (2015).

This Court has had several opportunities to consider the legality and the implications of the Lethal Injection Secrecy Act. *See Gissendaner II*, 803 F.3d at 569; *Wellons v. Comm'r*, *Ga. Dep't of Corr.*, 754 F.3d 1260, 1266–67 (11th Cir. 2014), *cert. denied sub nom.*, *Wellons v. Owens*, 573 U.S. 928 (2014); *Terrell v. Bryson*, 807 F.3d 1276, 1277 (11th Cir. 2015); *Jones v. Comm'r*, *Ga. Dep't of Corr.*, 811 F.3d 1288, 1292–94 (11th Cir. 2016).  In these cases—which involved Georgia death row prisoners who were seeking information concerning the source of Georgia's compounded pentobarbital—this Court deferred to the Lethal Injection Secrecy Act, recognizing that the confidentiality provided by the Act is necessary to protect Georgia's source of pentobarbital for use in executions and concluding that the  condemned inmates in these cases had no right to the disclosure of information made confidential by the Act, including information that would identify the supplier or source of the drugs to be used in the inmate's execution.  *See Jones*, 811 F.3d at 1292–94 (reviewing this Court's case law applying the Lethal Injection Secrecy Act).

Admittedly, the decisions in those cases did not address the quashing of a non-party subpoena under Rule 45(d)(3)(A)(iv).  But they acknowledged the states' significant interest in keeping information about the source of their lethal injection drugs secret.

### 2.    Litigation In Other Circuits Concerning Disclosure of Confidential Information Concerning a State's Source For a Drug Used in Executions

Courts in other circuits have considered the question before us in a Rule 45 context and have concluded that disclosure of lethal-injection-drug-supplier information—such as the information sought in the GDC subpoena—would impose an undue burden on a state.  *See In re Missouri Dep't of Corr.*, 839 F.3d at 736 (granting a writ of mandamus precluding the disclosure of Missouri's pentobarbital supplier on relevancy and undue burden grounds); *In re Ohio Execution Protocol Litig.*, 845 F.3d 231, 239 (6th Cir. 2016) (affirming the district court's Rule 26(c) protective order precluding disclosure of information that could reveal the identity of Ohio's lethal injection drug supplier because disclosure would impose an "undue burden" on the state); *Virginia Dep't of Corr.*, 2017 WL 5075252, at *3, *11 (granting the Virginia Department of Correction's motion to quash a subpoena to the extent the information sought in the subpoena "might lead to the disclosure of the supplier of the chemicals the VDOC utilizes in carrying out an execution or to the disclosure of the identities of the members of the VDOC

35

execution team"); *McGehee*, 2018 WL 3996956, at \*10 (concluding that full compliance with a subpoena served on the Texas Department of Criminal Justice, and seeking lethal injection drug supplier information, would create an undue burden on the state). These courts have held that a subpoena seeking such information must therefore be quashed under Rule 45(d)(3)(A)(iv).

The rationale of these decisions is best illustrated by the Eighth Circuit's undue burden analysis in a case involving the state of Missouri and the same Mississippi death row inmates who served the GDC subpoena that is at issue here. *See In re Missouri Dep't of Corr.*, 839 F.3d at 736. In that case, the Mississippi death row inmates served a third-party subpoena on the Missouri Department of Corrections, seeking "information regarding [Missouri's] use of pentobarbital in executions, including the identity of [Missouri's] anonymous supplier." *See id.* at 734. Missouri corrections officials moved to quash the subpoena in the district court on various grounds, including undue burden under Rule 45(d)(3)(A)(iv). *See id.* In support of their undue burden argument, the Missouri officials submitted an affidavit from the director of the state corrections department explaining that "because [Missouri's] pentobarbital suppliers require the assurance of confidentiality, producing the information sought by the inmates would result in the state no longer being able to obtain the drug for use in executions." *Id.* (internal quotation marks omitted).

36

The district court rejected the undue burden argument and denied the motion to quash, and the Eighth Circuit initially denied Missouri's petition for a writ of mandamus to prevent enforcement of the district court's ruling. *See id.* at 735. But upon rehearing, and based on its conclusion that Missouri's pentobarbital supplier would not provide the drug to Mississippi prison officials—and that it would in fact stop providing the drug even to Missouri if its identity were revealed pursuant to the subpoena—the Eighth Circuit held that disclosure of the information sought in the subpoena would impose an undue burden on Missouri.[6] *In re Missouri Dep't of Corr.*, 839 F.3d at 736. The court explained that Missouri has an interest in "exercising its sovereign power" to enforce its criminal laws, and that this interest would be harmed if disclosure of the drug supplier information requested in the subpoena caused Missouri to lose access to the drugs necessary to carry out a lawfully imposed death sentence. *See id.* Noting that the Missouri drug supplier information had "little, if any, relevance to" the Eighth Amendment claims asserted by the Mississippi inmates, given the supplier's reluctance to provide the drugs to Mississippi, the court concluded that the harm of disclosure "clearly outweighs the need of the inmates" for the information, and that

---

[6] The court also noted that the drug supplier information would not "remain relevant" to the claims asserted by the plaintiffs if, upon disclosure of its identity, the drug supplier "indisputably refuses to make pentobarbital available to anyone" including Mississippi. *See In re Missouri Dep't of Corr.*, 839 F.3d at 736.

37

compliance with the subpoena would thus impose an "undue burden" on Missouri. *Id.* at 736–37.

Although it was not mentioned in the Missouri decision, several of the courts that have denied disclosure of lethal injection drug supplier information pursuant to an undue burden analysis have relied in part on state secrecy statutes that—like Georgia's Lethal Injection Secrecy Act—are intended to maintain the confidentiality of such information. *See In re Ohio Execution Protocol Litig.*, 845 F.3d at 237 (noting that the district court "identified—as non-dispositive evidence—the existence of Ohio's secrecy statute" in support of its Rule 26(c) undue burden holding); *Virginia Dep't of Corr.*, 2017 WL 5075252, at \*18–19 (citing Va. Code Ann. § 53.1-234, which provides that the identities of lethal injection drug suppliers are confidential, exempt from the state Freedom of Information Act, and not subject to discovery unless good cause is shown); *McGehee*, 2018 WL 3996956, at \*7 (citing Tex Gov't Code Ann. § 552.1081, which exempts from the Texas Public Information Act disclosure of "identifying information" of lethal injection drug suppliers).

None of the courts in these cases held that the state secrecy statutes created a new federal evidentiary privilege that absolutely bars the disclosure of lethal injection drug supplier information. *See In re Ohio Execution Protocol Litig.*, 845 F.3d at 239 (rejecting the suggestion that the district court's reliance on the statute

38

had "federalize[d] the Ohio secrecy law as a common-law privilege for immunity"). Rather, the courts viewed the state statutes as evidence of the need for confidentiality with respect to such information, which need weighs heavily in the undue burden analysis. *See id.* at 237 (describing the concerns that led to the creation of Ohio's secrecy statute: "the burden on and prejudice to the state that disclosure presents" (internal quotation marks omitted)); *Virginia Dep't of Corr.*, 2017 WL 5075252, at *19 (characterizing the Virginia secrecy statute as "an evidentiary 'add-on' to the reasons counseling against disclosure"); *McGehee*, 2018 WL 3996956, at *7 (recounting the events that led to the enactment of the Texas secrecy statute, which included a "firestorm of angry emails, protests, and media coverage that ultimately dissuaded [a Texas pharmacy] from continuing to supply the TDCJ with lethal-injection drugs" (internal quotation marks omitted)).

Like those courts that have expressly addressed the relevance of state secrecy statutes in this context, we view Georgia's Lethal Injection Secrecy Act, not as creating a new federal evidentiary privilege, but as evidence of the need to maintain the confidentiality of the lethal injection drug supplier information requested in the GDC subpoena, which need clearly outweighs any interest Plaintiffs might otherwise have in obtaining the information. And like those courts, we agree that the undue burden provision of Rule 45(d)(3)(A)(iv) applies to bar disclosure of lethal injection drug supplier information when such disclosure

39

would jeopardize a state's ability to implement its death penalty laws. We explain our thinking.

### 3.    Application of Undue Burden Standard to the Present Case

We conclude (1) that Georgia has a strong interest in enforcing its criminal laws, including its death penalty laws; (2) that disclosure of the information requested in Plaintiffs' subpoena would clearly burden that interest; (3) that the relevance of the information to Plaintiffs' Mississippi case is marginal to non-existent; and (4) that Georgia's interests clearly outweigh Plaintiffs' interests in disclosure.

Georgia obviously has a strong interest in enforcing its criminal laws.  *See In re Blodgett*, 502 U.S. 236, 239 (1992) (noting the "great weight" of a state's interest in "exercising its sovereign power to enforce the criminal law").  This interest encompasses the state's ability to implement a lawfully imposed death sentence.  *See In re Ohio Execution Protocol Litig.*, 845 F.3d at 240 (citing authority for the proposition that a state "has an essential interest in carrying out a lawfully imposed sentence"); *see also Nelson v. Campbell*, 541 U.S. 637, 644 (2004) (calling the state's interest in implementing its death penalty laws "significant").  That Plaintiffs and others oppose the death penalty cannot justify providing Plaintiffs with a means to effectively end Georgia's ability to carry out its death sentences.  *In re Ohio Execution Protocol Litig.*, 845 F.3d at 240

40

(observing that "[o]pprobrium alone" should not be permitted to subvert this significant state interest.).

Second, as discussed at great length above, disclosure of the information sought by Plaintiffs in the GDC subpoena would greatly jeopardize Georgia's ability to implement its criminal laws because disclosure of the identity of its supplier would likely result in the loss of that source of supply. To summarize, and as recognized by the Supreme Court in *Glossip*, the historical record reveals that disclosure of the supplier for a particular drug used by a state in executions will have predictable consequences: anti-death penalty advocates will hound the supplier of that drug until the supplier capitulates and ceases supplying the drug. And without that drug or something comparable, the state's executions will necessarily cease. See discussion *supra* at 15–19.

Indeed, unable to obtain either sodium thiopental or pentobarbital—drugs that have been recognized as providing a humane method of lethal injection—as a result of the actual or feared retaliation by anti-drug penalty advocates, some states have turned to the drug midazolam, a sedative in the benzodiazepine family of drugs. Yet, midazolam has been the subject of numerous Eighth Amendment challenges, including the challenge mounted by Plaintiffs in the underlying Mississippi litigation. *See Glossip*, 135 S. Ct. at 2734–35. Other states, including Georgia, have managed to locate a source of pentobarbital from a compounding

41

pharmacy, on the condition that the identity of the pharmacy remain confidential. *See McGehee*, 2018 WL 3996956, at *3 (noting that such pharmacies "have attempted to keep their identit[ies] secret"). To ensure a continuing source of supply, some states have enacted statutes that protect the anonymity of the source or to otherwise assure confidentiality. See discussion at 19–22; *see also Waldrip v. Owens*, No. 1:14-CV-2119-WCO, 2014 WL 12496989, at *1 (N.D. Ga. July 8, 2014) ("One of the stated intentions of [Georgia's secrecy] law is to allow the [s]tate to obtain lethal injection drugs from manufacturers without the manufacturers having to face criticism from opponents of capital punishment, which might lead the manufacturers to refuse to provide the drugs."); *Owens*, 295 Ga. at 317 ("[W]ithout the confidentiality offered to execution participants by the statute, as the record and our case law show, there is a significant risk that persons and entities necessary to the execution would become unwilling to participate."); *Gissendaner II*, 803 F.3d at 569 ("To require . . . that Georgia open up about its source of pentobarbital would result in the drug becoming completely unavailable for use in executions, even though its use does not violate the Eighth Amendment."); *Arthur*, 840 F.3d at 1301 (citing testimony indicating that Alabama was unable to procure compounded pentobarbital for use in lethal injections despite contacting nearly thirty potential sources of the drug); *McGehee*, 2018 WL 3996956, at *7 (observing that Texas exempted lethal injection drug supplier

information from the disclosure requirements of its state Public Information Act after one such disclosure caused a "firestorm of angry emails, protests, and media coverage that ultimately dissuaded [a] pharmacy from continuing to supply [Texas] with lethal-injection drugs" (internal quotation marks omitted)).

Although these state laws do not give rise to a federal evidentiary privilege, they weigh heavily in the undue burden analysis because they are evidence of the strong interest states have in preventing disclosure of lethal injection drug supplier information and the burden to the states that disclosure of such information imposes. See discussion *supra* at 35–39.

Third, to determine whether the subpoena subjects the subpoena recipient to an undue burden, one must identify both that burden as well as the interests served by demanding compliance with the subpoena. As to the latter inquiry, the relevance of the requested information to the underlying litigation, or the lack thereof, is important. In addition, a subpoena recipient's status as a non-party to the litigation is also a factor that can weigh against disclosure.

Plaintiffs lose on both counts. GDC is not a party to Plaintiffs' underlying litigation with the State of Mississippi.[7] More importantly, and as explained

---

[7] Indeed, the Mississippi district court where the underlying action is pending has entered a protective order that prohibits Plaintiffs from obtaining drug supplier information even from the very Mississippi defendants who are parties to that action. *See Jordan v. Hall*, No. 3:15CV295HTW-LRA, 2018 WL 1546632, at *11 (S.D. Miss. Mar. 29, 2018) (concluding that "on balance, the hardship to the Defendants of preventing them from obtaining lethal execution

earlier, the relevance of the subpoenaed information to Plaintiffs' claims in the Mississippi case is marginal to non-existent. See discussion *supra* at 12–26. Plaintiff's purported reason for seeking the source of Georgia's compounded pentobarbital is to rebut Mississippi's defense that the latter is unable to find a source for pentobarbital. In other words, Plaintiffs would seemingly have us believe that if Plaintiffs could just identify the source of this drug, Plaintiffs could perhaps broker a deal between Mississippi and the now-anonymous Georgia supplier for the latter to provide this drug to Mississippi correctional administrators. Of course, that is a totally incredible argument. As explained above, once the Georgia supplier is identified, in defiance of a Georgia statute that promised the supplier confidentiality, there can be no suspense as to what will happen next. Its identity now unmasked, the supplier will either immediately stop providing the drug to Georgia or anyone else, or the supplier will eventually be hounded by anti-death penalty activists until it is forced to cease production of this substance. In short, disclosure of the supplier's identity is unlikely to bring Mississippi any closer to obtaining the compounded pentobarbital, which is the purported goal behind the subpoena.

---

drugs outweighs the Plaintiffs' need for this information, which could be gathered by other means").

44

Further undermining the relevancy of the requested information to Plaintiffs' is the fact that Plaintiffs' assertions suggest that they deem compounded pentobarbital as itself being unsafe and unconstitutional.  In fact, Plaintiffs seek an injunction against the use of compounded pentobarbital in executions, prompting one to further wonder what Plaintiffs would gain if we required Georgia to reveal its source, and thereby renounce its own promise of confidentiality.  See discussion *supra* at 22–26.

Yet, while it is unlikely that Plaintiffs would gain any information helpful in pursuing its claims challenging Mississippi's death penalty protocol should the subpoena be enforced, it is clear what the GDC would lose:  its source for compounded pentobarbital.  Thus, because the interests served by quashing the subpoena clearly and greatly outweigh the interests served by enforcing it, we conclude that enforcement would unduly burden the GDC and therefore Rule 45(d)(3)(A)(iv) requires that the subpoena be quashed.

## CONCLUSION

For all of the above reasons, we **AFFIRM** the district court's order granting the GDC's motion to quash.